Norman H. SINGER, Plaintiff,

v.

Gerald SCHER, Defendant.

Civ. A. No. 89–774 SS.

United States District Court,
District of Columbia.

Feb. 21, 1991.

Gerson Zweifach, Williams & Connolly, Washington, D.C., for plaintiff.

Daniel Grove, Keck, Mahin & Cate, Washington, D.C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SPORKIN, District Judge.

This case involves a dispute between the two partners of a now-defunct law firm. At issue are claims by the plaintiff Norman Singer to (1) one-half the proceeds realized by defendant Gerald Scher from the sale of certain stock options, and (2) one-half of certain equity securities purchased and held by Mr. Scher. These transactions occurred during the period that the plaintiff and the defendant were partners in a law firm.

This case was tried before the Court without a jury. After hearing the arguments of counsel, and after considering the entire record in the case, I am prepared to enter my findings of fact and conclusions of law.

*Background*

The litigants in this case were associated professionally from 1970 through 1988. Their professional association experienced four distinct stages. In 1970, the plaintiff, Mr. Singer, joined the law firm of Amram, Hahn & Sundlun as an associate. The defendant, Mr. Scher, was already employed by Amram, Hahn at that time, also as an associate.

In 1972, the Amram, Hahn firm was dissolved. Two of the partners of that firm, Bruce Sundlun and Bardyl Tirana, along with Mr. Scher, formed a new firm, called Sundlun, Tirana & Scher. Mr. Singer went to work for the new firm as an associate.

In 1974, the partners of Sundlun, Tirana & Scher offered Mr. Singer a partnership in the firm. Mr. Singer accepted this offer, becoming the firm's fourth partner. Mr. Singer was given a one-ninth share in the firm, with the remaining shares divided as follows: Mr. Sundlun had four-ninths, and Mr. Tirana and Mr. Scher each had two-ninths.

In 1977, both Mr. Sundlun and Mr. Tirana left the firm. Mr. Singer and Mr. Scher continued to practice as partners, with each having equal, one-half shares in the partnership. The new firm was called Sundlun, Scher & Singer. Even though Mr. Sundlun no longer retained a financial interest in the firm, he continued to be affiliated with the firm in an "of counsel" capacity, and his name remained in the firm name.

Mr. Singer and Mr. Scher continued to practice law together until 1988. With the exception of one ten-month interval in which the firm added a third partner, Mr. Scher and Mr. Singer constituted the entire Sundlun, Scher & Singer partnership throughout this period. In 1988, the partnership was dissolved.

Throughout their association, the professional fortunes of both Mr. Scher and Mr. Singer were tied closely to Mr. Sundlun. Mr. Sundlun was clearly the dominant partner in the Sundlun, Tirana & Scher firm. The firm's major clients were his clients. He spent very little time, however, actually practicing law for the firm. Instead, he was primarily engaged as an executive for the firm's two major clients—The Outlet Company ("Outlet") and Executive Jet Aviation ("EJA"). Mr. Sundlun was a director of each of these companies, he held significant management positions with each, and he had a substantial ownership interest in each. While the Sundlun, Tirana & Scher firm had clients other than these companies, in large part the firm functioned as an outside legal department for companies controlled in part or in whole by Mr. Sundlun. Mr. Tirana did corporate work for EJA, while Mr. Scher primarily represented Outlet. Mr. Singer was a litigator and represented both clients. In addition, he became the partner primarily responsible for Quest Corporation. Quest, which was the firm's third largest client, was also brought to the firm by Mr. Sundlun.

■ The dispute in this case centers on stock and stock options in Outlet obtained by Mr. Scher during the period he was a partner with Mr. Singer. Throughout this period, Mr. Scher served as a corporate officer of Outlet. Each year, Outlet offered stock options to certain key management employees. Mr. Scher had received such options prior to the formation of Sundlun, Scher & Singer, and he continued to receive them annually until 1983. He sold these options in 1984 and realized a profit of $92,748.86. In addition to these options, Mr. Scher purchased 35,200 shares of Outlet stock in 1986. These shares were purchased in connection with a leveraged buyout of Outlet organized by Mr. Sundlun and the Outlet management. Mr. Scher still holds these shares. Mr. Singer claims that both the stock options and the stock were partnership property that should have been divided between the two partners. Specifically, he seeks $46,374.43 from the profits realized by Mr. Scher on the stock options, and 17,600 shares of the Outlet stock.

*The Understanding Among the Sundlun, Tirana & Scher Partners*

■ Relationships among partners are governed above all by the intentions of the partners. D.C.Code § 41–117. Both the common law, *see, e.g. Day v. Avery*, 548 F.2d 1018 (D.C.Cir.1976), and the Uniform Partnership Act, D.C.Code §§ 41–117 through 41–123, establish a framework in which partners owe each other the duty of fairness and sharing. Within this framework, however, partners are free to set the specific rules of their partnership according to their objectives and desires. Usually, this is done simply through the execution of a written partnership agreement.

In this case, however, at no time was there ever a written partnership agreement between Mr. Scher and Mr. Singer. It is mind-boggling that attorneys who provide high-quality, meticulous representation to corporate clients nevertheless manage their

own affairs without ever confirming any of their understandings in writing. The plaintiff in this case is in effect asking this Court to write a partnership agreement after the fact. This the Court refuses to do. All that a Court can and should do in a case such as this is to find out what the partners' intentions were in organizing and operating their partnership. If such intentions differ from what a written agreement might have provided, the Court can do no more than to leave the parties in the position that they created for themselves.

The understandings and practices that governed Sundlun, Scher & Singer ("SSS") were first developed in the Sundlun, Tirana & Scher ("STS") firm. Even though Mr. Singer was only an associate at the inception of the STS firm, the original partners —Mr. Sundlun, Mr. Tirana, and Mr. Scher—developed understandings that carried through after Mr. Singer was brought into the firm.

The Court heard considerable testimony about the break-up in 1972 of Amram, Hahn & Sundlun, the firm that preceded STS. According to this testimony, the Amram, Hahn firm dissolved because Mr. Sundlun wanted to combine under one roof the provision of legal services with the pursuit of business opportunities. Mr. Sundlun at that time was already a corporate officer of Outlet and EJA, both of which were also his legal clients. He owned Outlet stock options and was about to become the controlling shareholder of EJA. Because Mr. Sundlun believed that his affiliation with Amram, Hahn restricted his ability to engage in these business activities, he left Amram, Hahn to form STS. His purpose in doing so was to establish a law firm in which he and his partners would be free to combine the practice of law with outside entrepreneurial ventures. Everyone in the new firm, including Mr. Singer, fully understood Mr. Sundlun's position and joined in his understanding as to how the new partnership was to operate.

The basis of the STS partnership was that all legal and retainer fees would be considered partnership income, which would then be divided among the individual partners. Salaries paid by firm clients to firm partners were also to be partnership income. Stock purchases or other investments in firm clients were to be excluded from the partnership income. All such items were solely the property of the individual partners.

The practice of the STS partners reflected this understanding. From the inception of STS, its partners had equity investments in client firms. Mr. Sundlun had extensive holdings in Outlet and EJA. These holdings were considered to be Mr. Sundlun's personal property and were never considered to be part of the law firm's income.

Mr. Tirana, in two purchases, acquired a substantial interest in EJA. These purchases were arranged privately; they were not purchases of stock on the open market. Mr. Tirana also purchased stock at a "bargain" price in another firm client, Technics, Inc. Mr. Tirana did not share with his partners any of these purchases or any profits derived from them.

Mr. Scher received stock options in Outlet annually throughout the life of the STS firm. These options were considered by Mr. Sundlun and Mr. Tirana to be the property solely of Mr. Scher.

I find that when Mr. Singer became a partner of STS in 1974 he was fully aware of and understood the practices of the STS partnership. He understood how the firm was to be run and what was to be considered partnership income. I find that when Mr. Singer became a partner of STS he willingly acquiesced in these understandings and practices.

*The Transition to Sundlun, Scher & Singer*

The STS firm dissolved in 1977 when Mr. Sundlun became the president of Outlet and Mr. Tirana joined the Carter Administration. The four partners held a meeting in March 1977 to resolve outstanding issues related to the dissolution of the firm. Among other things, the partners discussed the fact that Mr. Scher had received stock options from Outlet during the period of the partnership, and that Mr. Tirana had received profit-sharing payments from

EJA. It was understood and agreed to by the partners that both the stock options and the profit-sharing payments would be considered to be the property of Mr. Scher and Mr. Tirana, respectively. Mr. Singer was present at this meeting. He was therefore aware that Mr. Scher was receiving stock options from Outlet and was content for Mr. Scher to keep such holdings personal to himself.

For Mr. Singer to claim he was unaware of the partnership arrangement reached at the 1977 meeting is simply not credible. As early as 1974, Mr. Singer formally witnessed an options agreement between Mr. Scher and Outlet. It is inconceivable that so able and intelligent a lawyer as Mr. Singer did not know what was going on in his partnership, when each of the other partners clearly knew and understood how the firm was managed.

It was also decided at the March 1977 meeting that Mr. Scher and Mr. Singer would continue to practice law together as partners, as they had in the past, without a written agreement. Indeed, at no time did the two partners ever enter into a written partnership agreement. It is nonetheless plain and the Court finds that the same unwritten principles that controlled the STS partnership were to continue to govern the SSS firm. As in the past, all legal fees, retainer fees, and other compensation for ongoing legal services paid to either partner were to be considered partnership income and were to be divided equally between the two of them. Similarly, as in the past, when either or both partners were offered the opportunity to invest in their clients, these opportunities were to be considered to be solely the property of the individual partner, and were not to be shared or offered to the other partner.

*The Treatment of Stock Options by Sundlun, Scher & Singer*

The Court finds specifically that there is no evidence that either Mr. Singer or Mr. Scher intended to change the principles that had governed the STS partnership. It is absolutely clear that, after Mr. Sundlun and Mr. Tirana left the firm, Mr. Singer and Mr. Scher decided to continue to oper-ate their partnership under the same guiding principles that had obtained in the earlier firm. Under these principles, stock options and other such opportunities would be excluded from partnership income.

At the time Mr. Singer and Mr. Scher first began to function without Mr. Sundlun and Mr. Tirana, Mr. Singer was fully aware that Mr. Scher's stock options had been excluded in the past from partnership income. Until this lawsuit, he made no claim to them. Indeed, Mr. Singer himself received stock options from one of his clients in 1980. Mr. Singer kept these options for himself and he did not offer them to his partner.

Mr. Singer testified that he agreed at the March 1977 meeting to allow Mr. Scher to keep his Outlet stock options only because they were of relatively low value and he was more concerned to get other concessions from Mr. Scher, primarily an agreement by Mr. Scher that the two partners would share equally in partnership profits. It may well be the case that Mr. Singer did not want to give up his claim to Mr. Scher's stock options, and that he never thought that the stock options were legitimately excludable from partnership property. It remains true, however, that in 1977 Mr. Singer explicitly agreed that the stock options Mr. Scher received in the past were Mr. Scher's to keep. Mr. Singer acknowledges that his concession was part of a larger agreement from which Mr. Singer derived considerable benefits. That Mr. Singer gave up his claim to the stock options only in order to secure Mr. Scher's agreement to other terms of their ongoing partnership does not make Mr. Singer's actions any less probative of the principles that controlled the determination of partnership income.

*The Treatment of Outlet Shares Purchased by Mr. Scher*

The Court heard conflicting testimony as to whether Mr. Scher informed Mr. Singer that Mr. Scher was a participant in the 1986 leveraged buyout of Outlet. I find that Mr. Singer had knowledge of this transaction well before its consummation. I credit Mr. Scher's testimony that he in-

formed Mr. Singer of his role in the buyout several months before the transaction closed. I find that Mr. Scher was not obligated to share with or offer to Mr. Singer the opportunity to invest in Outlet in connection with the 1986 leveraged buyout.

It was the clear operating principle of the STS firm that individual partners' equity investments in clients were not to be offered to or shared with other members of the partnership. Such investments were a primary concern of Mr. Sundlun, Mr. Tirana, and Mr. Scher when they founded the firm. Mr. Sundlun maintained large, individual investments in firm clients throughout the life of the firm. Mr. Tirana also acquired partial equity ownership of firm clients. Again, when Mr. Singer and Mr. Scher agreed to practice law as Sundlun, Singer & Scher, they clearly did not intend to change the basic principles that had governed the firm from its inception.

The relationships between the STS partners and the firm's major corporate clients had been responsible for the success of the STS firm. The primary goal of Mr. Singer and Mr. Scher in embarking on the SSS venture was to maintain these relationships, and the legal fees they generated. Mr. Sundlun sought to ensure the continued availability to the companies he controlled of a law firm with which he was familiar, and which he trusted. All of the parties intended to perpetuate as much as possible the structure of the STS firm. All of them wanted to assure the continued existence, in essence, of the firm that had been STS.

At the time SSS was formed, Mr. Singer was aware that, had he demanded that partners' equity investments in client companies be treated as partnership property, there would have been no continuation of the STS partnership. Mr. Scher, who had a very close relationship with Outlet, and who served as its General Counsel, would not have agreed to sharing his Outlet investments with Mr. Singer. The Court cannot, at this time, rewrite the principles that controlled operation of the partnership. The Court finds that the intention of Mr. Singer and Mr. Scher in continuing the practice of law after Mr. Sundlun and Mr. Tirana left the partnership was to maintain at SSS the lucrative relationships that had benefitted STS. Consistent with this objective, Mr. Singer and Mr. Scher agreed to preserve the practices and understandings that had governed the STS partnership.

Under these practices and understandings, Mr. Scher was entitled to purchase Outlet stock without offering Mr. Singer the opportunity to participate in the buyout. In the STS firm, partners engaging in activities like the Outlet buyout did so as individuals, and the opportunities to make such investments were the exclusive prerogative of the individual partners. This was true of Mr. Sundlun's purchases of EJA stock, and of Mr. Tirana's purchases of EJA stock and Technics stock. Because the original arrangement among the STS partners as to what would constitute partnership income governed not only the STS firm but also the SSS partnership, Mr. Scher's Outlet purchase must be treated like the EJA and Technics purchases—that is, as excludable from the partnership assets.

The stock purchased by Mr. Scher was not given to him in lieu of a fee for legal services provided by SSS. Rather, a small group of Outlet managers bought out the interests of the prior controlling shareholder. Mr. Scher, as an Outlet executive and as its General Counsel, became part of the investing group. The shares were not intended as payment to Mr. Scher for legal services.

In fact, Outlet provided a considerable amount of legal work for SSS during the period of the buyout, all of which was compensated at the firm's customary rate that applied to Outlet. The fees generated by this representation were shared equally between Mr. Singer and Mr. Scher. Mr. Singer was aware that the buyout transaction was providing SSS with a substantial infusion of additional revenue. This is an added reason why Mr. Singer's claim that he did not know of the buyout transaction at an early date defies credibility.

SSS's representation of Outlet yielded substantial fees not only during the buyout

period, but throughout the life of the partnership. These fees, whether paid as hourly charges, retainer fees, or salaries, were always treated as partnership revenue. In 1986 Outlet paid Mr. Scher $330,000 in deferred compensation. Although Mr. Scher originally claimed the entire amount, he subsequently paid the money over to the partnership after realizing that deferred compensation was the sort of payment that was considered to be partnership revenue. The buyout transaction, in contrast, was like Mr. Scher's receipt of stock options, which were clearly treated by the parties as excluded from firm revenue. Stock options and stock purchases are different from fees and the parties have the right to treat them differently.

Law partnerships today are highly sophisticated enterprises. The traditional vision of a law firm, where the partners shared everything equally, no longer describes many present-day law partnerships. Many firms have adopted some of the revenue measuring and allocating techniques long employed by the businesses they represent. Indeed, some firms operate entirely on the guiding principle that a partner essentially "eats what he kills." Such a practice, as offensive as it may seem to some of the elders of the bar, is wholly consistent with the Uniform Partnership Act, which provides that partners' rights are ultimately derived from the partners' understandings and intent. *See* D.C.Code § 41–117.

■ The uncertainties of contemporary legal practice make it imperative for partners to set forth their agreements in writing. Where partners have abdicated this responsibility, the Court must determine what the parties had in mind when they commenced their association. In this case, it is clear that the income from all fee or revenue-generating activities was to be treated as partnership income. It is also abundantly clear that the parties never intended nor agreed that investment opportunities provided by firm clients were to be shared. Such opportunities were clearly to be excluded from the partnership revenues, as long as they were not provided to the partners in substitution for legal fees. Mr. Scher's opportunity to participate in the Outlet buyout was an opportunity outside the scope of his partnership with Mr. Singer. The Outlet stock is his exclusive property, and Mr. Singer's claim to a portion of the stock must be rejected.

These are my findings of fact and conclusions of law. Judgment in this case will be entered for the defendant Mr. Scher.