944 A.2d 1234

**Martin K. ALLOY, et al.**

v.

**The WILLS FAMILY TRUST.**

**No. 00026, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

March 31, 2008.

Stephen A. Bogorad (Judith F. Bonilla, Holland & Knight, LLP, on the brief), Washington, DC (Steven B. Gould, Brown & Gould, LLP, on the brief), Bethesda, for appellant.

M. Roy Goldberg (Christopher M. Loveland, Sheppard, Mullin, Richter & Hampton, LLP, on the brief), Washington, DC (David C. Driscoll, Jr., Stein, Sperling, on the brief), Rockville, for appellee.

Panel: ADKINS, CHARLES E., MOYLAN, JR. (Retired, Specially Assigned), JOSEPH F. MURPHY, JR.* JJ.

---

\* Joseph F. Murphy, Jr., now serving on the Court of Appeals, participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a specially assigned member of this Court.

ADKINS, J.

After the smoke cleared in this courtroom battle between commercial real estate partners, general partners Martin K. Alloy and Fred Farshey,[1] appellants and cross-appellees, owed limited partner The Wills Family Trust, appellee and cross-appellant, one dollar in nominal damages, for breaching their fiduciary duties by secretly acquiring and leasing competing warehouse properties. Neither side is happy with that result.

On appeal, Alloy and Farshey raise a single issue:

I. Did the trial court err in denying judgment in favor of Alloy and Farshey on the grounds that the conduct complained of is explicitly authorized in the Partnership Agreement and there was no evidence of actual damage to the Trust?

In its cross-appeal, the Trust presents five issues:

II. Did the trial court err in refusing to permit the Trust to seek relief in connection with appellants' efforts to "freeze" them out of the Partnership through oppressive conduct?

III. Did the trial court err in excluding evidence that the Trust suffered actual damages arising from appellants' breach of fiduciary duties, including striking the expert testimony of William C. Harvey and Thomas Porter?

IV. Did the circuit court err in forcing the Trust to separately litigate certain breach of fiduciary duty claims against appellants, by striking the Trust's third amended complaint, and denying leave to voluntarily dismiss the case?

V. Did the circuit court err in granting appellants' motion for summary judgment against the Trust's request for dissolution of the partnership?

---

1. Farshey is also known as Farmamarz Fardshisheh, the name used in the Partnership documents.

VI. Did the circuit court err in granting appellants' motion for summary judgment against the Trust's request for reformation of the partnership?

We find no error in the trial court's ruling that there was sufficient evidence to send the breach of fiduciary duty claim to the jury on the Trust's "secret competition" theory. We conclude, however, that the Trust's alternative breach of fiduciary duty theory arising from an alleged "freeze-out" scheme should also have been presented to the jury. To the extent relevant on remand, we briefly address the remaining issues.[2]

## FACTS AND LEGAL PROCEEDINGS

### Partnership Properties

SMC–United Industrial Limited Partnership (the Partnership) was formed in 1985, under District of Columbia law, for the purpose of purchasing, holding, and leasing commercial warehouses in the vicinity of 33rd and V Streets, N.E., Washington, D.C. By its terms, the Partnership is to continue for fifty years, until December 31, 2035, and is governed by D.C. law.

None of the original partners owned any other warehouses in the V Street area when the Partnership was formed. Most of the Partnership properties were acquired upon formation of the Partnership. The Partnership portfolio also included three properties purchased between 1986 and 1990, with the unanimous consent of partners, in accordance with the Partnership Agreement, as amended.[3] The total of Partnership

---

**2.** The Honorable Theodore G. Bloom participated in the initial hearing and conference of this case, but his death required a re-hearing and re-conference.

**3.** These properties were acquired as follows:

- 3515 V Street, known as the Douglas Distributing Warehouse, acquired in 1986, for $1.3 million, paid via a $225,000 capital contribution per partner, plus a loan.
- 2100 South Dakota Avenue, formerly a Shell station, acquired in 1989, for $177,000, paid with Partnership funds.

properties exceeds one million square feet. The Trust estimates the value of these properties at more than $50 million.

## Partnership Interests

From its inception, the Partnership has had two distinct groups of partners—the SMC Group, led by Alloy and Farshey, and the Wills Group, led by P. Reed Wills, II. These allegiances are reflected in the Partnership's two classes of general partners (Class I—SMC Group, Class II—Wills Group) and three classes of limited partners (Class A—SMC Group; Classes B and C—Wills Group). Among its constituent members, each group collectively owns 50% of the Partnership, with 3% of each Group share allocated to the general partners for that Group, and the remaining 47% allocated to the limited partners for that Group.

Within the SMC Group, the 3% Class I general partner interest is divided evenly among Alloy, Farshey, and SMC Second L.P. The 47% Class A limited partnership interest is allocated 29% to Alloy, 16 percent to Farshey, and 2% to SMC Second L.P.

Within the Wills Group, Reed Wills held the 3% Class II general partner interest, as well as a 4% interest as a Class B limited partner. The Trust holds a 38% interest as a Class B limited partner. Reed Wills's longtime employee, Robert Raymond, held a 5% interest as the sole Class C limited partner.[4]

In 1991, Reed Wills went into bankruptcy. In February 1993, both his general and limited partnership assets were transferred to a committee of his creditors. As a result, both the management control rights associated with Wills's 3% general partnership interest, and the cash flow rights associat-

---

- 3535 V Street, a warehouse acquired in 1990, for $3,686,190, paid via a new loan securing all Partnership property.

4. Raymond sold his partnership interest as part of a settlement of this litigation.

ed with Wills's 4% limited partnership interest, were held by the creditors' committee.

The committee sought to raise money to pay off Wills's debts, by offering Wills's partnership interests for sale to both the Trust and the SMC Group partners. The Trust did not exercise its right of first refusal under the Partnership Agreement. To avoid dealing with strangers to their business, Alloy and Farshey formed SMC–V Street Limited Partnership, which purchased Wills's partnership interests from the bankruptcy estate in July 1994, for $860,000.[5] Consequently, SMC–V Street stepped into Wills's shoes as the 3% Class II general partner and the 4% Class B limited partner.

Thus, as initially allocated and subsequently transferred, Partnership interests were as follows:

| | SMC Group | Wills Group |
|---|---|---|
| **General Partners** | **Class I General Partners (3%):** | **Class II General Partner (3%):** |
| | Martin K. Alloy 1% (managing general partner) | P. Reed Wills, II 3% (managing general partner) *(purchased by SM C-V Street Ltd. Partnership in July 1994)* |
| | Fred Farshey 1% (managing general partner) | |
| | SMC Second Ltd. Partnership 1% | |
| **Limited Partners** | **Class A Limited Partners (47%):** | **Class B Limited Partners (42%):** |
| | Martin K. Alloy 29% | P. Reed Wills, II 4% *(purchased by SM C-V Street Ltd. Partnership in July 1994)* |
| | Fred Farshey 16% | |
| | SMC Second Ltd. Partnership 2% | The Wills Family Trust 38% |
| | | **Class C Limited Partner (5%):** Robert Raymond 5% |
| **Total Interest** | **50% SMC Group** | **50% Wills Group** |

**5.** Under the Partnership Agreement, each partner has the right to sell his interest with the written consent of all general partners, subject to a right of first refusal provision. The opportunity to purchase an interest must first be made to other partners within the same group, whether it be the SMC Group or the Wills Group. If no one from that interest group exercises this right to purchase within 45 days, then the interest may be sold outside that group.

## Cash Flow Distributions And Allocations
## Of Taxable Income

Under the terms of their Partnership Agreement, the Trust, as a limited partner, would have no voice in managing the Partnership's business. The Agreement provides that the "business and affairs of the Partnership shall be controlled by the General Partners." "No limited Partner (in its capacity as a Limited Partner) shall (i) have the right or authority to act for or bind the Partnership [or] (ii) take part in the conduct or control of the Partnership's business." Thus, the Trust agreed to be bound by the business decisions of the Wills Group's Class II general partner, who was initially Reed Wills but later SMC–V Street L.P.

Critical to understanding the events surrounding this litigation, is one of the two cash flow allocation provisions in the Agreement. Most commonly, limited partners have the right to receive a *pro rata* share of any cash distributions made to partners, along with a pro rata share of any Partnership income for purposes of income tax liability, in proportion to the limited partner's equity interest in the partnership. If that had been the case here, the Trust would have been entitled to a share of any distributions as follows:

- The Class B taxable income share would equal 42% of total distributions, because that is the total equity interest of the two Class B limited partners (Reed Wills's 4% + the Trust's 38%).

- With its 38% equity interest, the Trust holds 90% of the total Class B equity. With his 4% equity interest, Reed Wills held 10% of the total Class B equity.

- If distributions to partners were allocated pro rata in the amount of each Class B partner's equity share, the Trust would receive 90% of the Class B distributions, or 37.8% of the total distributions paid to all partners (*i.e.*, 90% of the 42% share going to Class B partners). Conversely, Wills's Class B limited partnership interest of 4% would receive 10% of the total Class B distribution, or 4.2% of the total distributions made to all partners.

But that is not what happened, because, although Reed Wills preserved these *pro rata* allocations for taxable income, he modified them for distributions of Capital Cash Flow, and "flipped" them for distributions of Operating Cash Flow. In doing so, Wills limited the Trust's economic rights to receive income from ongoing Partnership operations, while maintaining *pro rata* the Trust's responsibilities to pay income taxes. Once Reed Wills lost his partnership interests in bankruptcy, the cumulative effect of these provisions has been to leave the Trust with a negative cash flow created by taxable income allocations that exceed Partnership distributions. Ultimately, this situation has given the Trust a strong financial incentive to force the sale of Partnership properties and/or dissolution of the Partnership. A detailed examination of these tailored allocations, and their consequences for the partners, follows.

Under the terms of the Partnership Agreement, Capital Cash Flow distributions are made from net proceeds of sales or refinancing of one-third or more of the property owned by the Partnership.[6] With respect to these distributions, the Partnership Agreement alters the usual *pro rata* allocation formula described above, by directing that the share allocable to Class B limited partners [7] be distributed (a) first, in the

---

**6.** The Agreement defines "Capital Cash Flow" as

> The net proceeds of a Capital Transaction (as hereinafter defined) less (A) reserves (as hereinafter defined) to be retained by the Partnership (to the extent that Operating Cash Flow is insufficient to bring such Reserves to necessary amounts), and (b) any amount necessary to pay any operating deficit of the Partnership.

"Capital Transactions" include

> a sale or other disposition of all or substantial portion (*i.e.,* one-third or more) of the total assets of the Partnership, (2) any substantial refinancing or mortgaging of the Property (*i.e.,* an amount equal to one-third ($\frac{1}{3}$) or more) of the total assets of the Partnership....

"Reserves" include amounts set aside for real estate taxes and operating capital.

**7.** Other distributions from Capital Cash Flow take priority over the distributions to the Class B partners. Specifically, each of the managing general partners is first entitled to receive up to $250,000 total during the life of the Partnership. Thereafter, Capital Cash Flow must be applied next "to the payment of accrued interest on Cash Needs

sum of "$90,000[ ] per annum, on a cumulative basis," to Reed Wills's Class B limited partnership interest, and only then (b) the remainder divided pro rata between the Trust and Reed Wills's Class B limited partnership interest, according to their 90% and 10% shares of the Class B interests, respectively. Once Alloy and Farshey's SMC–V Street Limited Partnership acquired Reed Wills's Class B partnership interest, of course, the right to any such $90,000 annual payment from Capital Cash Flow distributions was no longer held on account of an entity controlled by Reed Wills or any of the Trust beneficiaries.

Operating Cash Flow distributions reflect net profits generated by the Partnership through its properties and operations.[8] With respect to these distributions to the Class B partners,[9] the Partnership Agreement effectively turns the typical allocation formula on its head. Wills accomplished this by directing that the Partnership Agreement provide that "the

---

Loans" and then "to the payment of the principal amount of Cash Needs Loans[.]" Only then is the remaining Capital Cash Flow payable to the Class B partners as set forth above.

**8.** The Partnership Agreement defines "Operating Cash Flow" as
> the total cash of the Partnership held by the Partnership at the last day of the fiscal quarter, less the sum of the following:
> (i) undistributed Capital Cash Flow;
> (ii) Reserves;
> (iii) payments of principal and accrued interest on mortgages, loans, and other obligations of the Partnership that are due within twenty (20) days after the end of the fiscal quarter to the extent that cash receipts within said twenty (20) days are insufficient to make such payments; and
> (iv) all costs and expenses of acquiring, holding and developing the Partnership property, including ... legal and accounting fees, real estate taxes, all other carrying charges, all costs and expenses of operation of the improvements and the Partnership, including ... payment of any and all operating expenses.

Under the terms of the Partnership Agreement, beginning in 1988, distributions of Operating Cash Flow are due within 30 days after the end of each fiscal quarter.

**9.** With respect to other partners, the Agreement provides that net Operating Cash Flow "shall be distributed to the Partners, *pro rata*, in proportion to their respective Percentage Interests[.]" Only the Class B partners are exempted from this provision.

share of Operating Cash Flow distributable to the Class B Limited Partners" be allocated at the rate of "ninety percent (90%) to P. Reed Wills and ten percent (10%) to the Wills Family Trust."

The result is that the Trust has a 38% equity interest in the Partnership, with attendant income tax liability in that same percentage, but it only receives 4.2% of net profits generated by the Partnership properties and paid out as Operating Cash Flow distributions. In contrast, Alloy and Farshey's SMC–V Street Limited Partnership receives 37.8% of all the Operating Cash Flow distributions, but has attendant income tax liability of only 4% of the taxable income generated by the Partnership. Individually and through their SMC Second Limited Partnership, Alloy and Farshey also receive another 50% of the Operating Cash Flow distributions, with attendant income tax expenses in the same percentage.

Collectively, therefore, the interests controlled by Alloy and Farshey receive a total of 87.8% of any Operating Cash Flow distributions generated by the Partnership properties, but pay only 54% of the income taxes that are passed through to the partners. In contrast to this positive balance, the Trust receives only 4.2% of such distributions, but pays 38% of the income taxes. The cumulative result is that the Alloy/Farshey interests have a +33.8% differential between its income from Operating Cash Flow and its expenses for taxes, whereas the Trust has a–33.8% differential between its income from Operating Cash Flow and its tax expenses.

These allocations reflect Reed Wills's estate and tax planning priorities at the time the Partnership was formed. According to Sheldon Liptz, Wills' friend and accountant, whom Wills appointed as Trustee, Wills intended "to keep as much of the current income as possible for himself, and yet have the appreciation in the property pass to the next generation."

For that reason, Wills structured the Trust's interest in the Partnership to be primarily a deferred, long term equity interest in Partnership assets (*i.e.*, properties), rather than a significant source of income. Consistent with this intent,

Reed Wills restricted the Trust's share of income from Operating Cash Flow, and directed that these distributions would be payable to Reed Wills's wife Joanne Wills, for as long as her husband is alive, rather than to the Trust. At the time Wills designed the Trust's partnership interest, then, he intended that, during his lifetime, the 42% share of Operating Cash Flow distributed to Class B partners would end up in either his account or his wife's account. On the flip side of that coin, he planned that he would be individually liable for only 10% of the income taxes allocated to the Class B partners (translating to just 4.2% of all Partnership-generated tax expenses), whereas the Trust would pay the lion's share of 90% of those taxes (translating to 37.8% of all taxable income generated by the Partnership).

Thus, Trust beneficiaries, including Wills's children, could not expect that income from Partnership operations or sales of Partnership Property would pass through the Trust to them until after Wills's death or the Partnership terminated. Moreover, such payments would never be substantial, given the 4.2% limitation on the Trust's share of Operating Cash Flow distributions.

Problems with Reed Wills's plans became evident in 1991, after he and his wife filed for bankruptcy protection, which in turn resulted in Alloy and Farshey (through their SM C–V Street L.P.) purchasing Wills's interest as a 4% Class B limited partner. After that, neither Reed Wills nor the Trust could look to the Partnership for a substantial amount of income from Partnership operations. The 37.8% and 3% shares of Operating Cash Flow distributions that Reed Wills planned to put into his individual pocket as a limited and general partner, respectively, were paid instead to an Alloy/Farshey partnership.

The disparity between cash distributions and income tax liability has been dramatic. Since its inception, the Partnership has prospered, generating both substantial Operating Cash Flow distributions and substantial income tax liabilities, due to its commercial warehouse leasing operations. Against

a total of $275,000 in capital contributions from all partners over the life of the Partnership, there have been 22 Operating Cash Flow distributions over a 20 year period, totaling $6,243,166.66, which Alloy and Farshey contend represents a 2200% return on capital investment.

With the small percentage of distributions paid out to the Trust, the Trust is naturally in need of funds over and above its Operating Cash Flow distributions to pay its share of income taxes generated by the Partnership.[10] The dynamics of the Trust's minimal share of operating income, lack of management voice, substantial tax liabilities, and illiquid share of capital equity, effectively place the Trust at the financial mercy of Alloy, Farshey, and the other entities affiliated with the SMC Group. Not surprisingly, a rift developed. We turn next to that story line.

### The Trust's Complaints

Farshey, and to a lesser extent Alloy, worked in the day-to-day management of the Partnership and its properties. In the early years of the Partnership, from 1986–1990, when Reed Wills still held his Class B limited partnership interest, Farshey and Alloy informed the Wills Group partners when warehouse properties in the V Street neighborhood became available. The Partnership Agreement requires the unanimous approval of all partners for acquisitions of additional property. As set forth above, the Partnership added three properties to its portfolio in this manner. *See supra* note 2.

According to the Trust, once Wills filed bankruptcy, Alloy and Farshey stopped notifying the Trust about other V Street properties that came onto the market, no longer invited the Trust to attend Partnership meetings, and failed to inform the

---

**10.** Although Capital Cash Flow distributions would provide a source for such funds, and the Trust is entitled to 37.8% of such distributions, the Partnership has made no Capital Cash Flow distributions. This is because most of the Partnership properties were acquired in 1985, upon formation of the Partnership, or within the next four years, and the requisite one-third or more of these properties have not been sold or refinanced.

Trust of what occurred in those meetings. Instead, Alloy and Farshey secretly acquired three commercial warehouse properties for themselves. These non-Partnership properties allegedly competed with the Partnership warehouses, given that, as Farshey testified, "properties in the neighborhood all compete with each other."

Moreover, Farshey and Alloy hired their own company, Stanley Martin Commercial, Inc. (SMC), to provide exclusive leasing and management services to the non-Partnership properties, even though at the same time and unbeknownst to the Trust, SMC was providing the same services for the competing Partnership properties. As a result, SMC collected leasing and property management fees from both Partnership and non-Partnership properties.

Moreover, payments for property management services to the Partnership were not offset in any way. The Trust contends that this violated its right under the Partnership Agreement to receive a portion of any management fees paid by the Partnership for services rendered to the Partnership Properties. In anticipation of the Partnership's property management contract with SMC, an entity controlled by Alloy and Farshey, section VIII(H) of the Partnership Agreement Partnership provides that such a "Related Party" agreement "must be fully disclosed to all of the General Partners[.]" Moreover, "[a]ny fee paid to the Managing General Partners or Related Party for property management services shall be paid two-thirds (⅔) to the Managing General Partners (or such Related Party) and one-third to the Wills Group."

According to the Trust, Farshey and Alloy treated the Partnership and non-Partnership properties as a single "assemblage," totaling 1.7 million square feet of commercial warehouse space within SMC's "inventory" for prospective tenants. Farshey acted as the contact leasing agent for both sets of properties. In that conflicted capacity, he had knowledge of financial and leasing information for these competing properties.

Over the life of the Partnership, distributions from Operating Cash Flow totaled more than $6 million to all partners. Payments were made according to the respective shares directed in the Partnership Agreement. After making regular distributions for the period 1988 through 1997, however, the Partnership made no distributions to the Trust or any other partner from 1998 through 2003. Distributions resumed in the second quarter of 2004, after this litigation began.

During this same period, the Trust allocated substantial taxable income to the Trust. Because the Trust's share of taxable income is 37.8% of all Partnership income, but its share of distributions from Operating Cash Flow is only 4.2%, the Trust's share of taxes significantly exceeds its share of distributions. Although the Trust does not pay taxes directly, its beneficiaries are charged with their respective shares of the taxable income allocated to the Trust.

In early 2002, the Trust beneficiaries, led by Reed Wills's son Trey Wills and Trustee Liptz, retained Daniel Clemente to serve "as a consultant to review … their investment in" the Partnership. His assignment was "to enhance the value of the [T]rust's investment in SMC United Industrial Limited Partnership."

After reviewing Partnership records, Clemente met with Farshey in April 2002. By that time, Clemente had concluded that a "change [in] the status quo" was in order. "If necessary[,]" he wanted to "break up the [P]artnership." He told Farshey that "if the partnership was dissolved that the partners would own the property as tenants in common instead of as partners and that would give us some control over our own value within the partnership."

In August 2003, Clemente was appointed a Trustee of the Trust. According to Clemente, the following month at a political fundraiser, Alloy confronted Clemente about a "million dollar offer that he had made to Mr. Liptz, that we would never get more than a million dollars for the … 38 percent interest[.]" Alloy also complained about the considerable

"trouble Mr. Willis['s] bankruptcy had caused to he and Mr. Farshey[.]"

In June 2004, the Trust filed suit in the Circuit Court for Montgomery County against Alloy, Farshey, SMC Second, SMC–V Street, and SMC. After partially successful motions to dismiss, the Trust filed a seven count Second Amended Complaint in April 2005. At issue in this appeal are claims for breach of fiduciary duty, including the duty of loyalty and the duty of care, against Farshey, Alloy, and SMC–V Street.[11]

Count Two against Alloy and Farshey is based on allegations that they breached their fiduciary duties by:

- "secretly acquiring the Adjacent Properties and having [them] compete with the Partnership Properties for the same class of tenants seeking to lease industrial or commercial space in the same area";

- "acquiring the Adjacent Properties and thereby preventing themselves from considering uses or a sale of the Partnership Properties in a manner that is not linked to the existence of and plans for the Adjacent Properties";

- "creating an untenable conflict of interest whereby their interest in the Partnership Properties is inextricably tied to their desire to exploit their financial investment in the acquisition of the Adjacent Properties";

---

**11.** The Second Amended Complaint sets forth the following counts:
 One—breach of contract—failure to pay portion of management fees—Alloy and Farshey
 Two—breach of fiduciary duty and duty of loyalty—Alloy and Farshey
 Three—breach of fiduciary duty, duty of care, duty of loyalty—SMC-V Street
 Four—reformation or dissolution—Alloy, Farshey, SMC Second, SMC–V Street
 Five—accounting—Alloy, Farshey, SMC Second, SMC–V Street
 Six—money had and received—Stanley Martin Commercial
 Seven—unjust enrichment—Stanley Martin Commercial
 The circuit court granted a post-discovery defense motion for summary judgment on the reformation/dissolution claim, but denied the motion with respect to the remaining counts.

- "secretly engaging the same related leasing and property management company owned by them—defendant Stanley Martin Commercial—to act as the sole and exclusive leasing and management agent for both the Partnership Properties and the Adjacent Properties' ";

- "causing and/or failing to take the necessary steps to prevent a tenant of the Partnership Properties—Washington Wholesale Liquors—from leaving Partnership Properties on one or more occasions in favor of new space within the Adjacent Properties";

- "actively interfering with efforts by third parties to make an offer to purchase the Partnership Properties despite the clear interest of the Trust in having a commercially reasonable offer be presented to and properly considered by the Partnership under section IX(c) of the Agreement";

- "preventing and actively refusing to provide any tangible benefit to the Trust for years, despite economic conditions that clearly could have permitted Alloy and Farshey to ensure that such a benefit was enjoyed by the Trust";

- "failing to timely inform the Trust regarding the Partnership Properties and by failing to include them in meetings of the Partners";

- "failing to advise the Trust of its rights under section VIII(h) of the Agreement to receive a portion of the management fees paid to Stanley Martin Commercial and Stanley Martin Companies";

- "making tax allocations to the partners that fail to reflect the substantial economic effect of the Partnership's distribution of income to its partners";

- "offering no more than $1 million for the Trust's 38–percent ownership interest in the Partnership despite the fact that the Partnership Properties are worth at least $50 million";

- "attempting to 'freeze out' the Trust from the benefits of its ownership of thirty-eight percent of the Partnership";

- "refusing to provide the Trust with financial information and documentation relating to the Partnership despite the request for such information and materials by the Trust"; and

- "failing to ensure that the Partnership was paying compensation at 'reasonable and competitive rates' with respect to the property management services provided by their related company, Stanley Martin Commercial."

The Trust sought damages for "the amount that the Trust should have received in distributions and management fees, and the amount it should obtain in distribution of proceeds from the sale of the Partnership Properties."

With respect to SMC–V Street, who stepped into Reed Wills's shoes as managing general partner of the Wills Group, the Trust alleged in Count Three that it breached its fiduciary duties "[a]s the sole general partner of the Wills Group" by:

- "failing to review the Agreement to identify and attempt to protect the rights and interests of the Wills Group and the Trust under the Agreement, including the right of the Wills Group and the Trust under section VIII(h) of the Agreement to receive a portion of the fees paid by the Partnership to Stanley Martin Commercial for property management services";

- "failing to take any actions to ensure that the Trust receives any tangible benefit from its 38–percent ownership interest in the Partnership"; and

- "actively interfering, through acts of its principals Alloy and Farshey, with efforts by third parties to prepare and make an offer for the Partnership Properties that would be in the best interests of the Trust."

The Trust requested compensation for "the amount the Trust should have received in management fees from July 1994 to the present, and the amount the Trust would obtain from a distribution of proceeds from the sale of the Partnership Properties."

On October 28, 2005, three months before trial, the Trust filed a Third Amended Complaint. In addition to the claims

outlined above, the Trust further asserted that Alloy and Farshey refused to consider two offers to purchase the Partnership Properties,[12] and retaliated against the Trust after the Second Amended Complaint was filed, by demanding nearly $500,000 in payment for allegedly breaching the terms under which Alloy and Farshey purchased Reed Wills's partnership interests.

The circuit court granted a defense motion to strike the Third Amended Complaint. At the hearing on that motion, the court concluded that it would unduly prejudice the defendants by creating a need to reopen discovery on the new issues and to continue the trial date. Thereafter, the Trust unsuccessfully moved to dismiss voluntarily the Second Amended Complaint so that it could be re-filed and tried along with the new issues raised in the stricken Third Amended Complaint.

## Counterclaims And Defenses

The defendants counterclaimed for reformation of the Partnership Agreement provision concerning allocation of management fees paid to a Related Party like SMC. Alleging scrivener's error, they pointed out that the Trust did not provide any of the property management services for which such compensation was paid. The Defendants also moved unsuccessfully for a separate trial, seeking to adjudicate their reformation counterclaim before trial on the Trust's claims.

Alloy and Farshey substantively disputed the Trust's allegations that they breached their fiduciary duty by secretly acquiring non-Partnership properties and secretly competing with Partnership properties. As a threshold matter, they pointed out that the Partnership Agreement specifies that the

---

12. The Trust alleged that, on August 26, 2005, it tendered to SMC–V Street a contract from Sheridan Development Company, LLC and O'Connor North American Property Partners, L.P. to purchase the Partnership property for $48.9 million. When the defendants refused to consider that offer, the Trust presented SMC–V Street with an alternative offer by BECO Management, Inc. to purchase the Partnership Property for $48 million.

business of the Partnership is limited to acquisition and operation of certain warehouse properties that were identified at the inception of the Partnership. Moreover, they pointed to a provision of the Partnership Agreement that they believe authorizes their acquisitions of non-Partnership properties.

Furthermore, Alloy and Farshey disputed the Trust's contention that there was financial damage from their activities. When challenged to cite a specific instance in which the Trust was monetarily damaged, the Trust alleged that Farshey twice placed a former Partnership tenant, Washington Wholesale Liquors, into non-Partnership warehouses at 2800 V Street and 3001 V Street, and that they offered non-Partnership property, rather than Partnership property, to the Federal Bureau of Investigation. We set forth Alloy and Farshey's defense to these allegations in more detail below.

### Alloy And Farshey's Account Of Their Acquisition And Management Of Competing Properties

2800 V Street, N.E., known as the "Sears Distribution Center," is a multi-warehouse property consisting of Units A, B, C, D and E. According to Alloy and Farshey, Farshey tried repeatedly to convince the other SMC partners to purchase this property for the Partnership. But Alloy and Wills, and then subsequently Wills's creditors' committee, responded that they were not interested in the acquisition.

As a result, Farshey formed 2800 V Street Limited Partnership to purchase the property, and invested $1 million in cash, which he raised in part from his own family. Alloy, in order to accommodate Farshey, acquired an indirect 12.5% minority interest in 2800 V Street LP.

2800 V Street LP later purchased a second warehouse at 2900 V Street. Alloy also objected to the Partnership purchasing this property on the ground that the price was too high, he wanted to maintain liquidity, he did not want to sign for a loan as general partner, and he would not invest any more money in the Partnership for acquisitions.

A third property in the V Street vicinity was acquired in 2002 by SMC Learning Centers Limited Partnership, in which Alloy and Farshey are general partners.[13] The owner of a vacant warehouse at 3001 V Street, N.E. told Farshey that he wished to sell. Once again, Alloy did not want the Partnership to purchase this property. In addition to his ongoing liquidity concern, Alloy did not want to invest in a property that would require so much work. Farshey purchased all but 5% of Alloy's interest in SMC Learning Centers LP, which in turn did a tax free exchange of a day care property for the warehouse property.[14]

The Trust contended that in three instances, Alloy and Farshey's breach of their fiduciary duties caused tenants to lease space in one of these non-Partnership properties rather than in one of the Partnership properties. The three allegedly diverted leases in question are: (1) a 120,000 sq. ft. lease to Washington Wholesale Liquors (WWL) by 2800 V Street LP, (2) a 36,000 sq. ft. lease to the FBI by 2800 V Street LP, and (3) a 42,000 sq. ft. lease to WWL by SM C Learning Centers LP.

In response, Alloy and Farshey disputed that it was in their best financial interests to steer these tenants away from Partnership properties. Alloy pointed out that his interest in the Partnership is much greater and generates more cash flow than his minority interest in either 2800 V Street LP or SMC Learning Centers LP. Whereas he receives more than 50% of Operating Cash Flow distributions made by the Partnership, he only receives 12–13% of such distributions from 2800 V Street LP. Moreover, he sold his 5% interest in SMC Learning Centers LP in 2003. Thus, his share of every distributed dollar from the Partnership is more than 50 cents, but his share of every distributed dollar from 2800 V Street LP is

---

**13.** This partnership name reflects that it was created by Alloy and Farshey in the mid–1980s for the purpose of building day care facilities. By 1989, that partnership had ceased such work.

**14.** About 15 months later, Farshey bought out Alloy's remaining 5% interest in SMC Learning Centers LP.

approximately 12.5 cents, and from SMC Learning Center LP is now nothing.

With respect to Farshey, the defense contended that Alloy's participation in the day-to-day management of the Partnership prevented Farshey from diverting tenants for his own gain. The close business partnership these two have enjoyed over 20 years includes daily telephone discussions and weekly meetings. Farshey allegedly advised Alloy of every contact with a prospective tenant and every lease signed for non-Partnership properties. In addition, Farshey allegedly solicited Alloy's approval of the fairness of any proposed transaction.

Moreover, with respect to the individual leases, Alloy and Farshey presented evidence to refute the Trust's claim that these tenants would have leased Partnership properties "but for" Farshey's "double dealing" for non-Partnership properties:

- In 1997, Washington Wholesale Liquors (WWL) moved out of Partnership warehouse space and into much larger space at 2800 V Street. Testimony and correspondence from Joseph Gallagher, president of WWL, confirmed that none of the Partnership properties available at that time could accommodate the company's space needs.

- In 1998, the FBI leased 36,000 sq. ft. at 2800 V Street, although the Partnership's 3515 V Street was vacant. The Partnership property was not suitable space because the FBI needed room to construct a ramp that would allow a truck to be driven into the warehouse and the mezzanine office space at 3515 V Street prevented the Partnership from building an extra high loading dock opening for oversized trucks.

- In 2005, WWL leased 42,000 sq. ft. at 3001 V Street, at a time when 50,000 sq. ft. was available at 3030V Street, one of the Partnership properties. Alloy and Farshey offered correspondence and testimony from Gallagher to show that WWL's needs could not be met by the Partnership property because it had only one loading dock, rather than the five docks at 3001 V Street.

## Exclusion Of Expert Testimony

Trial began on January 23, 2006. The next morning, the court granted defense motions to exclude the Trust's proffered expert testimony on damages. The Trust planned to call William Harvey, a real estate appraiser, to give his opinion that the market value of the Partnership Property exceeds $50 million, and Thomas Porter, an accounting and valuation expert, to opine that the amount the Trust should be compensated for its 38% interest, based on that value, is $11,282,433. Porter also intended to testify that (a) the Trust suffered $4.2 million in damages when the defendants failed to sell the Partnership Properties in 1993, by refusing an offer that was $5 million above appraised value at that time; and (b) that the Trust also suffered approximately $23,000 in damages when prospective tenants for Partnership properties leased space in Alloy and Farshey's competing non-Partnership properties.

The defense moved *in limine* to preclude Harvey from giving his opinion of value, on the ground that such testimony would not be relevant to the damages available for the specific breaches of fiduciary duty alleged by the Trust. The court agreed, and granted the motion.

In addition, Alloy and Farshey moved to preclude Porter from opining about the Trust's share of lost rent that could have been collected from tenants who leased space in non-Partnership properties rather than Partnership properties. The defense argued that the Trust did not present any evidence that the alleged breach of fiduciary duties caused harm in that tenants leased competing properties rather than Partnership Properties. The court preliminarily denied the motion, subject to the Trust later establishing a triable issue as to whether the available Partnership properties could have suited the space needs of these "lost" tenants. At the close of the Trust's case, the court held that the Trust failed to offer sufficient evidence of such causation to warrant compensatory damages, and struck Porter's lost rental income testimony.

### Judgment On Other Claims

After the close of all evidence, the trial court also granted the defense motion for judgment on the Trust's claim for compensation based on its share of property management fees paid to SMC. Thus, the jury was not presented with the property management fee claim as the basis for the Trust's breach of fiduciary duty cause of action. As a result, judgment was entered in favor of the defendants on Count One for breach of contract, Count Six for money had and received, and Count Seven for unjust enrichment.

The trial court also granted defense motions for judgment on remaining claims in the Second Amended Complaint, including most of the breach of fiduciary duty claims. The sole surviving theory of liability for breach of fiduciary duty was that Alloy and Farshey wrongfully acquired, managed and leased the non-Partnership properties without advising the Trust of such activities. But even that theory was severely limited on the ground that the Trust presented no evidence of actual damages. Thus, the Trust was permitted to ask the jury only for nominal damages for the presumed injury to the relationship between the partners.

The jury found Alloy and Farshey liable for breach of fiduciary duty and awarded one dollar in nominal damages. The trial court denied a defense motion for judgment notwithstanding the verdict. These timely appeals followed.

## DISCUSSION

### I.

### Alloy/Farshey Appeal: Presentation Of The Trust's Breach Of Fiduciary Duty Claim To The Jury

Alloy and Farshy ask us to vacate the judgment in favor of the Trust on their breach of fiduciary duty claim, for two reasons. First, they argue, the Partnership Agreement precludes such a claim because it explicitly authorizes partners to acquire other properties. Second, as a matter of law, the Trust could not establish breach of fiduciary duty without

evidence that the conduct complained of caused economic damages. After reviewing the terms of the Partnership Agreement and the duties owed by partners to each other and the Partnership, we consider and reject both arguments.

## Fiduciary Duties

Under District of Columbia partnership law, which applies to the Partnership, the duties of each partner to each other and to the partnership are established by statute, but may be adjusted by the terms of a partnership agreement. *See* D.C.Code § 33–103.03(a). In pertinent part, D.C.Code section 33–104.04 [15] provides:

(a) The only fiduciary duties a partner owes to the partnership and the other partners are the duty of loyalty and the duty of care set forth in subsections (b) and (c) of this section.

(b) A partner's duty of loyalty to the partnership and the other partners is limited to the following:

(1) To account to the partnership and hold as trustee for it any property, profit, or benefit derived by the partner in the conduct ... of the partnership business or derived from a use by the partner of partnership property, including the appropriation of a partnership opportunity;

**(2) To refrain from dealing with the partnership in the conduct ... of the partnership business as or on behalf of a party having an interest adverse to the partnership;** and

**(3) To refrain from competing with the partnership in the conduct of the partnership business** before the dissolution of the partnership....

---

**15.** Although this Code section governs operation of general partnerships, it has been made applicable to limited partnerships. *See* D.C.Code § 33–204.03(a)("Except as provided in this chapter or in the partnership agreement, a general partner of a limited partnership shall have the rights and powers and is subject to the restrictions and liabilities of a partner in a partnership without limited partners").

**(d) A partner shall discharge the duties to the partnership and the other partners under this chapter or under the partnership agreement and exercise any rights consistently with the obligation of good faith and fair dealing.**

(e) A partner does not violate a duty or obligation under this chapter or under the partnership agreement merely because the partner's conduct furthers the partner's own interest. (Emphasis added.)

D.C.Code section 33–101.03, governing partnership agreements, incorporates a view of partnership duties that has been described as "contractarian." *See generally* Larry E. Ribstein, *Fiduciary Duty Contracts in Unincorporated Firms*, 54 Wash. & Lee L.Rev. 537, 541 (1997)(noted partnership treatise author, as a "contractarian" who regards a partner's fiduciary duties as "simply a species of contract" that can be waived in a partnership agreement, refutes arguments by "anticontractarians" against enforcing waivers of the duty of loyalty). It provides, in pertinent part:

(a) Except as otherwise provided in subsection (b) of this section, relations among the partners and between the partners and the partnership are governed by the partnership agreement. To the extent the partnership agreement does not otherwise provide, this chapter governs relations among the partners and between the partners and the partnership.

**(b) The partnership agreement may not:** ...

(3) **Eliminate the duty of loyalty** under § 33–104.04(b) or § 33–106.03(b)(3), **but:**

(A) **The partnership agreement may identify specific types or categories of activities that do not violate the duty of loyalty, if not manifestly unreasonable;** or

(B) All of the partners or a number or percentage specified in the partnership agreement may authorize or ratify, after full disclosure of all material facts, a specific act or transaction that otherwise would violate the duty of loyalty; ... [or]

(5) Eliminate the obligation of good faith and fair dealing under § 33–104.04(d), but the partnership agreement may prescribe the standards by which the performance of the obligation is to be measured, if the standards are not manifestly unreasonable[.]

D.C.Code § 33–101.03 (emphasis added).

■ Moreover, "[s]ince general partners in a limited partnership typically have the exclusive power and authority to control and manage the partnership, they owe the limited partners an even greater fiduciary duty than is imposed on general partners in the typical general partnership." J. William Callison & Maureen A. Sullivan, *Partnership Law and Practice: General and Limited Partnerships* § 22:7 (Westlaw database updated through Sept. 2007). Thus, with certain limits including the nonwaivable requirement of fulfilling the duty of loyalty in good faith, "partners are free to set the specific rules of their partnership according to their objectives and desires." *Singer v. Scher,* 761 F.Supp. 145, 146 (D.D.C. 1991). Consequently, even some "common law and statutory standards concerning relationships between parties can be overridden by an agreement reached by the parties themselves." *Day v. Sidley & Austin,* 394 F.Supp. 986, 992 (D.D.C.1975), *aff'd,* 548 F.2d 1018 (D.C.Cir.1976), *cert. denied,* 431 U.S. 908, 97 S.Ct. 1706, 52 L.Ed.2d 394 (1977).

In this case, the Partnership Agreement identifies the limited partnership as a business venture relating to an aggregated 22 acres comprised of real properties located "along the north and south sides of V Street, N.E. at 33rd Street, N.E. Washington, D.C., upon which are located one-story masonry and brick warehouse buildings," as "more particularly described in" an exhibit incorporated into the Agreement, listing specific property addresses. The Partnership Agreement refers collectively to these parcels as "the Property" and states that "[t]he business and purpose of the Partnership is to own, develop, improve, operate and maintain the Property as an investment for the production of income and profit."

**A.**

## Scope Of Fiduciary Duties Under
## The Partnership Agreement

Alloy and Farshey moved for judgment on the Trust's breach of fiduciary claim, arguing *inter alia* that the terms of the Partnership Agreement effectively waive any objection the Trust might have to their acquisition and leasing of competing warehouse properties. Invoking the statutory authorization given to partners to "identify specific types or categories of activities that do not violate the duty of loyalty," *see* D.C.Code § 33–101.03(b)(3)(A), Alloy and Farshey contend that the following provision in the Partnership Agreement authorizes them to acquire, develop, and lease competing warehouse properties in the V Street market, without permission from the Trust:

The Partnership shall be a limited partnership only for the purposes specified in Article II hereof, and this Agreement shall not be deemed to create a partnership among the Partners with respect to any activities whatsoever other than the activities within the business purposes of the Partnership as specified in Article II hereof. **Any of the Partners may engage in and possess any interest in other business or real estate ventures of any nature and description, independently or with others, including but not limited to, the ownership, financing, leasing, operating, managing and developing of real property;** and neither the Partnership nor the other Partners shall have any rights in and to such independent ventures of the income or profits derived therefrom. (Emphasis added.)

The trial court denied the defense motion, reasoning as follows:

[T]he big issue[ ] is this section in the partnership agreement that allows them to basically buy a piece of property, manage a piece of property, lease a piece of property anywhere, any place and **it is indeed a very broad and general provision.**

But there is testimony, testimony even from Mr. Alloy in this case, that is consistent with the D.C. Partnership Act, where he testified and the actions of the partnership were, initially up until the time of Reed Wills bankruptcy, **that any time a piece of property came up for sale that was going to be in conflict, it was offered to the partnership, and the partners were all made aware of the fact that it was available and it was up; that after Reed Wills indicated that he was not interested in 2800 V Street, which was right around the time that he was going bankrupt, that is apparently when Martin Alloy and Fred Farshey stopped advising the limited partnership of their efforts to buy certain properties**. . . .

And **Mr. Alloy . . . testified that he felt a moral and ethical obligation to advise everybody what [was] going on up until the point where they bought Reed Wills' share out.** It seems to me that under the general standards of the partner's conduct, the past conduct of the business and common sense, that is that, I'll use the example of [counsel for the Trust] . . ., and that is if you're in the restaurant business and your partner is getting ready to buy a restaurant across the street, you ought to tell him. Maybe he's not interested in buying in with you, maybe he can't afford to, but he ought to have the opportunity to say look, you know, this is going to be in direct conflict with what we do, it's going to, it may cause us harm and it may put you in a direct conflict situation, so how are we going to deal with that.

**These other properties purchased by Mr. Alloy and Mr. Farshey, the limited partners were not advised of any of that, so I think the evidence is sufficient to go to the jury on that issue.** (Emphasis added.)

Alloy and Farshey do not dispute that the evidence cited by the trial court in support of its ruling exists. Rather, they renew their argument, asserting that the trial court erred as a matter of law in sending the Trust's breach of fiduciary duty claim to the jury

because the conduct complained of—Alloy and Farshey's acquisition, management and leasing of nearby warehouse properties through 2800 V Street LP and SMC Learning Center—was expressly permitted by terms of the Partnership Agreement and therefore cannot constitute grounds for a breach of fiduciary duty claim.

In support of their interpretation of the Partnership Agreement, Alloy and Farshey argue that "[t]he facts in this case are very similar to" *Dremco, Inc. v. South Chapel Hill Gardens, Inc.*, 274 Ill.App.3d 534, 211 Ill.Dec. 39, 654 N.E.2d 501, *appeal denied*, 164 Ill.2d 561, 214 Ill.Dec. 318, 660 N.E.2d 1267 (1995). That case involved a joint venture (which the court treated as a partnership) between Hartz Construction Co. and Dremco, to acquire and develop a 33 acre parcel, and later another 40 acres nearby. After the venturers disagreed on a development plan, they divided their jointly held properties and initiated the process of ending the joint venture. During that winding up period, Hartz purchased a 13.8 acre parcel located immediately north of the 40 acre parcel previously acquired by the joint venturers. Dremco claimed that Hartz breached its fiduciary duty by usurping its opportunity to acquire the 13.8 acres.

The motion court granted summary judgment in favor of Hartz, ruling as a matter of law that the unambiguous terms of the Joint Venture Agreement precluded the claim. *See id.* at 39, 654 N.E.2d at 504. Affirming, the Appellate Court of Illinois held that "[t]he corporate [sic] opportunity doctrine is inapplicable here, given the singular purpose of this enterprise" and the "dispositive" contractual language. *Id.* at 39, 654 N.E.2d at 505–06. The joint venture agreement "limited the scope and purpose of the enterprise to the purchase and development" of the two specified properties, and "memorialized ... the partners' right to independently pursue other opportunities[,]" *id.* at 39, 654 N.E.2d at 505, in the following language:

"[N]othing herein contained shall be construed to constitute any Joint Venturer the agent of any other Joint Venturer *or*

*to limit in any manner any Joint Venturer in carrying on of its own respective business or activities."* . . .

"Any Joint Venturer may engage in and/or possess any interest in other business and real estate ventures of any nature or description, independently or with others, including, but not limited to, the ownership, management, operating, financing, leasing, syndication, brokerage, and development of real property; *and neither the Joint Venture nor any Joint Venturer, by reason of this Agreement or by reason of holding an interest in this Joint Venture, shall have any right or interest in or to any such independent venture of the income or profits derived therefrom."*

*Id.* at 39, 654 N.E.2d at 505 (emphasis added in *Dremco* ).

The *Dremco* Court reasoned that the 13.8 acre tract "was not within the joint venture's line of business[,]" because "Dremco and Hartz were not bound to each other except with respect to the specifically identified joint venture property." *Id.* at 39, 654 N.E.2d at 505. The amendment of the joint venture agreement to add the 40 acre tract to the original venture "did not change the limited scope of the business, but merely expanded it from one property to two." *Id.* at 39, 654 N.E.2d at 505.

Alloy and Farshey also rely on a second case that they contend features "language virtually identical to the language at issue here." In *Cowin v. Ross,* 64 A.D.2d 552, 406 N.Y.S.2d 841 (1978), *aff'd,* 46 N.Y.2d 977, 415 N.Y.S.2d 991, 389 N.E.2d 472 (1979), a limited partner declined an invitation by general partners to acquire and develop property immediately adjacent to the first partnership's complex. The limited partner sued, alleging a violation of the partnership opportunity doctrine. The court granted summary judgment in favor of the general partners, construing the following language in the partnership agreement as dispositive evidence that they "acted within their contractual rights in forming" the second partnership. *See id.* at 841.

" . . . Any partner may engage independently or with others in other business ventures of every nature and description

including, without limitation, the ownership, operation, management, syndication and development of real estate and neither the Partnership nor any Partners shall have any rights by reason of this Agreement in and to such independent ventures or the income or profits derived therefrom."

*Id.* Arguing that the language in their Partnership Agreement is substantively identical to the provisions construed in *Dremco* and *Cowin*, Alloy and Farshey contend that the Trust's breach of fiduciary duty claim is precluded for the reasons articulated in those decisions.

The Trust counters that (1) there is nothing in the Partnership Agreement that explicitly or implicitly waives the duty of loyalty to the extent of authorizing the undisclosed transactions at issue here; and (2) even if there were, such a provision would be unreasonable as a matter of law, and therefore unenforceable pursuant to D.C.Code § 33–101.03(b)(3). In support, the Trust argues that "there is a strong presumption against waiver of the duty of loyalty," and "no evidence that the Partners intended to waive the duty of loyalty to permit secret acquisition, leasing and management of competing properties." Most importantly, the Trust argues, there is no language in the Partnership Agreement that "specifically identif[ies] 'acquisition, leasing and management' of competing warehouse properties located next door to the warehouse properties owned by the Partnership as a type of category that general partners may engage in without disclosure to and consent from the other partners." To the contrary, the Trust points out that, before W ills's interest was transferred in bankruptcy proceedings, Alloy and Farshey routinely brought opportunities to acquire neighboring commercial properties to the attention of all partners. In the Trust's view, this was sufficient evidence to create a jury question on the question of whether the Partnership Agreement gave Alloy and Farshey "carte blanche" to secretly compete.

To resolve this assignment of error, we need not decide whether a partnership agreement must contain explicit authorization to acquire, manage, or lease competing "next door"

property in order to effectively waive the duty of loyalty, or whether such a waiver provision would be "manifestly unreasonable" within the meaning of section 33–101.03(b)(3). For purposes of this appeal, we shall assume without deciding that (1) language explicitly authorizing partners to compete with the partnership business is not required to waive the duty not to compete,[16] (2) the waiver in this Partnership Agreement is specific enough to unambiguously identify the purchase and offer of competing commercial warehouses in the same V Street neighborhood as "specific types or categories of activities that do not violate the duty of loyalty," and (3) such a waiver of the duty of loyalty is "not manifestly unreasonable." Even with these assumptions, we hold that the trial court correctly declined to rule as a matter of law that the Partnership Agreement authorizes Alloy and Farshey's secret acquisition and promotion of competing warehouse properties.

Here, the trial court explicitly rested its decision to send the breach of fiduciary duty claim to the jury on a determination that there was a disputed factual issue regarding Alloy and Farshey's nondisclosures, *i.e.*, whether they were required to notify the Trust when competing properties became available, as well as when they offered and leased such competing properties for their own account. As we read it, this ruling properly recognizes that, in the circumstances of this case, the jury reasonably could conclude that Alloy and Farshey had a fiduciary duty of disclosure arising from their unwaivable obligation to "exercise any rights" they may have had to compete with the Partnership in the V Street market "consistently with the obligation of good faith and fair dealing." *See* D.C.Code § 33–104.04(d). In denying the defense motion for judgment, the trial court reasoned that, notwithstanding the limited business purpose of the Partnership and the contract language cited by Alloy and Farshey, the partners may have been obligated to disclose all Partnership opportunities and

---

16. For an example of a partnership agreement authorizing partners to "compete, directly or indirectly, with the business of the Partnership[,]" see *Kahn v. Icahn*, 24 Del. J. Corp. L. 738, 1998 WL 832629, *2 (Del.Ch.1998)(such language "anticipated the type of conduct alleged").

management conflicts of interest to the Trust. We find no error in that ruling.

■ A partners' fiduciary duty has three overlapping elements: "(1) the duty of loyalty; (2) the duty of good faith and fair dealing; and (3) the duty of full disclosure." Callison & M. Sullivan, *Partnership Law and Practice, supra*, § 12:1. Under prevailing partnership law, which is followed in the District of Columbia, "[t]he duty of loyalty includes a duty to disclose all material facts concerning the partnership business, together with all facts connected with transactions involving partnership interests[.]" *Id.*, § 12.5. *See, e.g., Latta v. Kilbourn*, 150 U.S. 524, 541, 14 S.Ct. 201, 207, 37 L.Ed. 1169 (1893)("one partner cannot, directly or indirectly, . . . take any profit clandestinely for himself"); *Spector v. Konover*, 57 Conn.App. 121, 747 A.2d 39, 44 (2000)("defendants breached their fiduciary duty by not making a free and frank disclosure of all the relevant information"). Similarly, the duty of good faith and fair dealing may give rise to a disclosure obligation. *See, e.g.*, Revised Uniform Partnership Act (RUPA) § 404 cmt. 4 (recognizing, in reference to uniform provision identical to D.C.Code § 33–104.04, that "[i]n some situations, the obligation of good faith includes a disclosure component"); *cf., e.g., Riss & Co. v. Feldman*, 79 A.C.1951)(managing partner breached fiduciary duty to make good faith disclosure of plan to transfer partnership assets to corporation in which he held an interest). Thus, " '[t]he fiduciary nature of the partnership relation requires at all times the highest degree of good faith, and precludes any secret profit, benefit or advantage of any kind.' " *Marmac Investment Co. v. Wolpe*, 759 A.2d 620, 626 (D.C.2000) (citation omitted). *Cf. Helms v. Duckworth*, 249 F.2d 482, 486–87 (D.C.Cir.1957)(fiduciary duties of stockholders in close corporation are similar to those of partners, and include "a fiduciary duty to deal fairly, honestly, and openly with their fellow stockholders and to make disclosure of all essential information").

In this case, even if we were to assume that the Trust waived certain competition aspects of the duty of loyalty,

including the prohibitions against acquiring competing properties and simultaneously working for a competing entity in the same commercial warehousing market, it did not thereby waive its right to be notified of such Partnership opportunities and conflicts. The language cited by Alloy and Farshey as a waiver of the duty not to compete with the Partnership does not purport to curtail such disclosure obligations. If we read the quoted provision as a permissible identification of "specific types or categories of activities that do not violate the duty of loyalty," *see* D.C.Code § 33–101.03(b)(3)(A), as Alloy and Farshey suggest, nevertheless there is no language that "prescribes the standards by which the performance of the [unwaivable] obligation [of good faith and fair dealing] is to be measured[.]" *See* D.C.Code § 33–101.03(b)(5). Thus, nothing in the Partnership Agreement itself relieves Alloy and Farshey of their obligation to disclose Partnership opportunities and competing transactions in the good faith exercise of their fiduciary duty of loyalty.

In *Marmac Investment Co., Inc. v. Wolpe*, 759 A.2d 620 (D.C.2000), the District of Columbia Court of Appeals recognized that a breach of fiduciary duty claim may be premised on a managing general partner's failure to disclose that he earned fees stemming from transactions involving partnership properties. In that case, however, Wolpe, the managing general partner, did not breach his fiduciary duty by taking fees as an independent consultant on a complicated transaction resulting in the sale of partnership property. *See id.* at 626–27.

■ In this case, we must determine whether, on the evidentiary record before us, a reasonable juror could conclude that, through their course of dealing, the partners agreed that prompt disclosure of Partnership opportunities and conflicts would be the measure of each partner's loyalty and good faith in transactions that competed with the Partnership. That theory of liability was advanced by the Trust, and apparently accepted by the jury. We find sufficient evidence in the record to support a breach of fiduciary duty judgment

on the basis of Alloy and Farshey's failure to disclose their acquisitions and brokering of properties that competed with the Partnership.

Martin Alloy testified that neither he nor Farshey owned any other properties in the V Street area when the Partnership was formed. He conceded that the Partnership Agreement itself is "silent as to" whether he could acquire property on V Street. Thus, Alloy admitted, his belief that he could do so was premised on his view that such freedom to compete was "implicit" from the provisions authorizing partners to engage in other real estate ventures.

Shortly after the Partnership was formed, however, opportunities to purchase nearby warehouse properties arose and were presented to Alloy, who managed the existing Partnership properties. Over its first five years, the Partnership elected to purchase some of those properties, *e.g.*, the Douglas Distribution Center at 3515 V Street in 1986, a Shell station property at 2100 South Dakota Avenue in 1989, and another warehouse at 3535 V Street in 1990. Thus, the record shows that from the inception of the Partnership in 1985 until Reed Wills's interest was sold by the bankruptcy trustee to Alloy and Farshey's new SMC–V Street Ltd. Partnership in 1994, Alloy disclosed Partnership opportunities.

When asked why he told the Wills Group partners about the availability of these nearby warehouse properties, Alloy testified that he considered such disclosures to be mandatory.

[Counsel for the Trust]: When the opportunity to acquire the Douglas Distributing Warehouse, the first one, No. 28 on the map, you believed that you had a moral and ethical obligation to disclose that opportunity to your fellow partners. Isn't that true?

[Alloy]: That is true.

Q: And you believed you had a moral and ethical obligation to disclose that because the property was immediately adjacent to the partnership properties. Isn't that true?

A: It's adjacent to 27.

Q: So, you testified before about Article 1 of the partnership agreement and the language that you believe gives you carte blanche to do whatever you want. But you've also testified now that because this property was adjacent to a partnership property, you had a moral and an ethical obligation to disclose it to your limited partners. Isn't that correct?

A: That is correct.

Q: You also had a moral and ethical obligation to disclose the opportunity to buy 3535 V Street, No. 29. Isn't that true?

A: Yes.

Q: And in December 1991, Fred Farshey presented to the entire partnership the opportunity to buy 2800 V Street. Is that correct?

A: The, it's correct. The date I'm not exactly sure of but yes I will agree to it.

Alloy further testified that, after Reed Wills's Partnership interests were transferred to entities controlled by Alloy and Farshey, he understood that he had a responsibility, as the Wills Group general partner member, "to protect the interests of [his] fellow members of the Wills Group." Despite that duty, Alloy admitted that he did not review the Partnership Agreement "to know what rights existed for members of the Wills Group[.]" Nor did he disclose the opportunities to purchase the properties that he and Farshey acquired thereafter.

Fred Farshey confirmed that both he and Alloy considered it their duty to disclose the availability of other commercial properties in the V Street market. He opined that, if he had ever discovered that Alloy had acquired four or five competing properties for his own account, without telling him or getting his approval, it would be "wrong of Mr. Alloy to do that behind [his] back." When asked whether the purchase of Reed Wills's interest in 1994 "extinguished that moral and ethical obligation" to tell the Trust about the availability and acquisi-

tion of warehouse properties in the V Street market, Farshey
responded that he thought the obligation to disclose continued.

Nevertheless Farshey also testified that, once Reed Wills no
longer controlled the Wills Group's general partnership inter-
est, he and Alloy acquired several other commercial ware-
house properties in the area of the Partnership properties,
without asking the Trust whether it "would be interested in
acquiring" those properties. He identified five properties that
he and Alloy acquired without offering them to the Partner-
ship or advising the Trust: 3001 V Street in 2001, the Cron-
heim warehouse at 2900 V Street in April 1997, 2800 V Street,
2850 V Street, and 2301 Bladensburg Road. Like Alloy, Far-
shey asserted a belief that it was not necessary to offer these
properties to the Partnership. For example, when asked why
he did not present "the opportunity to acquire 3001 V Street
to your limited partner, the Wills Family Trust," Farshey
replied, "I didn't have to. It was, the partnership agreement
said we could buy anything on the street. They agreed to it
by that agreement."

In addition to failing to inform the Trust of these opportuni-
ties, Farshey also admitted that the Trust was not advised
about these acquisitions, even "after the fact." With respect
to 2900 V Street, for example, Farshey admitted that he "did
not disclose" that August 2001 purchase until this litigation
began.

Collectively, this evidence was sufficient for the jury to
conclude that, even if Alloy and Farshey were authorized to
acquire and offer competing properties, they breached their
fiduciary duties by doing so secretly. The trial court did not
err in denying the defense motion for judgment on this
ground. Indeed, the jury's verdict on the Trust's breach of
fiduciary duty claim may reasonably be interpreted as a
finding that Alloy and Farshey acted in bad faith when they
acquired and leased competing properties without telling the
Trust that they were doing so.

Such nondisclosure of partnership opportunities and com-
peting business interests during the life of the Partnership
materially distinguishes this case from both *Dremco* and *Cow-*

*in,* the cases cited by Alloy and Farshey. Neither of those decisions supports the defense rationale advocated in this case, *i.e.,* that the partners authorized each other to ***secretly*** acquire and develop properties that would directly ***compete with the ongoing business*** of the partnership.

In *Dremco,* there was no ongoing business with which to compete, as there is in this case. When Hartz purchased the disputed 13.8 acre property adjacent to the former joint venture's property, the joint venture was no longer in existence. *See Dremco,* 211 Ill.Dec. 39, 654 N.E.2d at 503. By that time, Dremco and Hartz had already executed a settlement agreement equally dividing the venture's 40 acre property. Because the disputed 13.8 acre property was not part of the joint venture itself, and otherwise could not compete with a venture that no longer existed, the court ruled that the "opportunity doctrine is inapplicable here[.]" *Id.* at 39, 654 N.E.2d at 505–06. Here, in contrast, the Partnership is scheduled to last until 2035, so that, at the time Alloy and Farshey acquired and offered competing properties, the Partnership remained active as a competitor in the V Street commercial warehouse market.

In *Cowin,* there was no secret competition, as there was in this case. The partners who were sued for misappropriation of a partnership opportunity not only told the plaintiff partner about the opportunity to purchase and develop an adjacent property, but they also offered him an opportunity to purchase an interest in the newly formed partnership that acquired the property. *See Cowin,* 406 N.Y.S.2d at 841. *See also Marmac Inv. Co.,* 759 A.2d at 620 (all partners knew and approved consulting fee paid to managing general partner's company); *Holmes v. Keets,* 153 F.2d 132, 134 (D.C.Cir.1946)(plaintiff partner "knew, when he signed the partnership agreement, that appellee owned" competing adjacent property).

## B.

### Nominal Damages For Breach Of Fiduciary Duty

As alternative grounds for reversing the breach of fiduciary duty judgment, Alloy and Farshey argue that "since no admis-

sible evidence of actual damages was adduced by the Trust at trial, the claim never should have gone to the jury." We find no District of Columbia precedent explicitly deciding whether a cause of action for breach of a general partner's fiduciary duties is viable when there is no evidence of resulting monetary loss to the limited partner.

In *Riss & Co. v. Feldman*, 79 A.2d 566 (D.C.1951), the District of Columbia Municipal Court suggested in *dictum* that a partner may recover nominal damages for breach of a fiduciary duty of disclosure. In that case, a capital partner sued after the managing partner transferred the partnership's business assets to a corporation in which the managing partner held an interest, without consulting the capital partner. Concluding that the managing partner had a fiduciary duty of good faith disclosure, in order to give the capital partner an opportunity to protect himself by making objections, the court held that the managing partner "failed entirely in his duty towards" the capital partner. *See id.* at 571. On the question of damages, the court briefly observed in *dictum* that, "[i]f he could prove no other damages, plaintiff would at least be entitled to nominal damages for this wrong." *Id.*

In *Maxwell v. Gallagher*, 709 A.2d 100, 102 (D.C.1998), the District of Columbia Court of Appeals affirmed a nominal damage award of $1.00 for an attorney's failure to disclose information that could affect his legal judgment, while using language suggesting that some showing of injury is required, even though such injury may not be in the form of economic losses. The *Maxwell* Court did not analyze the issue presented here, because the question on appeal was whether the client's failure to prove economic losses caused by the breach precluded an award of punitive damages, not whether it precluded liability for breach of fiduciary duty. On that question, the court explained:

> Although the trial judge ordered cancellation of the stock transfer, she also found "no record evidence of any meaningful evaluation of the stock" at the time it was divided. Nor did the appellees present at trial any evidence of the dollar value of the stock. This exemplified what the trial

judge found to be a complete failure of the appellees to present proof of loss from the breach of duty for which compensatory damages could be awarded. Maxwell and Bear argue that, in the absence of such proof, it was error for the trial judge to award punitive damages. We are constrained to agree. Despite some uncertainty in our decisions over the years, the principle we derive from them is that, before punitive damages may be awarded, there must be a basis in the record for an award of actual damages, even if nominal. Since the trial judge expressly found no such basis in the record of this case, punitive damages will not lie. . . .

We think the essence of our case law is this: A plaintiff must prove a basis for actual damages to justify the imposition of punitive damages. The amount of such damages may be nominal, stemming from the difficulty of quantifying them or from some other cause. But without proof of at least nominal actual damages, punitive damages may not be awarded.

*Id.* at 104 (citations omitted).

The District of Columbia appellate court acknowledged, but did not discuss, the trial court's distinction between "proof of 'injury' " for purposes of establishing the cause of action, and " 'evidence of any loss occasioned by' the injury" for purposes of establishing compensatory damages. *See id.* at 103. In doing so, the court defined "actual damages" in terms of economic losses caused by the breach, but distinguished that remedy from alternative remedies such as rescission of transactions tainted by the breach. *See id.* at 103 n. 8 (trial court "might have concluded that rescission of the transfer to Maxwell & Bear remedied the loss to the [client] and obviated the need for actual damages"). The *Maxwell* Court stated without further explanation that there was "ample justification for a finding of injury" arising from the nondisclosures and self-interested dealing. *See id.* at 103. *Cf. Chesapeake & Potomac Tel. Co. v. Clay,* 194 F.2d 888, 890 (D.C.Cir.1952)(distinguishing between nominal damages "awarded to a plaintiff whose legal right has been technically violated but who has

proved no real damage" and compensatory damages "awarded to repair the actual damage which the plaintiff proved he suffered at the hands of the defendant").

In *Marmac Investment Co. v. Wolpe,* 759 A.2d 620 (D.C. 2000), the District of Columbia Court of Appeals recognized that a cause of action for breach of fiduciary duty may be premised on either the proximate injury suffered by the non-breaching partners or the proximate benefit to the breaching partner. In concluding that the managing general partner did not breach his fiduciary duty by taking a fee for facilitating the sale of partnership property, the court observed:

> The partnership in no way suffered because of Wolpe's actions; to the contrary, the partnership benefitted from the sale of the property at a price which apparently netted each partner more than the partners initially instructed Wolpe to obtain. *See Beckman v. Farmer,* 579 A.2d 618, 625 (D.C.1990) (citing *Day v. Avery,* 548 F.2d 1018, 1029 n. 56 (D.C.Cir.1976)) ("breach of fiduciary relationship is not actionable unless injury arose to the beneficiary or the fiduciary profits thereby"); Theophilus Parsons, *A Treatise on the Law of Partnership* 225 (1867) (partner is liable "if he makes any private bargain ... for his own benefit, which either inflicts a loss upon the partnership, or turns to himself advantages which belong to all in common ...").

*Id.* at 626.

Alloy and Farshey cite several cases in support of their position that nominal damages are not available for a bad faith breach of the fiduciary duty of loyalty. One is a frequently cited decision from the Court of Appeals for the District of Columbia Circuit. In *Hendry v. Pelland,* 73 F.3d 397, 401–02 (D.C.Cir.1996), the federal appellate court held that it is not necessary for a client to prove that his attorney's breach of fiduciary duty proximately caused monetary injury in order to recover the legal fees paid for the tainted representation. Although that case does not address the issue presented here, we find the decision and rationale instructive.

The *Hendry* Court concluded that there are important policy and practical reasons for permitting a breach of fiduciary duty cause of action against an attorney without proof of monetary damages flowing from the breach. The federal court reasoned:

[T]o the extent [the clients] sought disgorgement of legal fees, they needed to prove only that [the attorney] breached his duty of loyalty, not that his breach proximately caused them injury. Although we have found no District of Columbia cases precisely on point, courts in other jurisdictions have held that clients must prove injury and proximate causation in a fiduciary duty claim against their lawyer if they seek compensatory damages, not if, as here, they seek only forfeiture of legal fees. Even courts that sometimes do require a showing of injury and causation in claims seeking only forfeiture of legal fees have stated that it is not necessary when the clients' claim is based, again as here, on a breach of the duty of loyalty. . . .

The different treatment of compensatory damages and forfeiture of legal fees also makes sense. Compensatory damages make plaintiffs whole for the harms that they have suffered as a result of defendants' actions. Clients therefore need to prove that their attorney's breach caused them injury so that the trier of fact can determine whether they are entitled to any damages. Forfeiture of legal fees serves several different purposes. It deters attorney misconduct, a goal worth furthering regardless of whether a particular client has been harmed. It also fulfills a longstanding and fundamental principle of equity-that fiduciaries should not profit from their disloyalty. And, like compensatory damages, it compensates clients for a harm they have suffered. Unlike other forms of compensatory damages, however, forfeiture reflects not the harms clients suffer from the tainted representation, but the decreased value of the representation itself. Because a breach of the duty of loyalty diminishes the value of the attorney's representation as a matter of law, some degree of forfeiture is thus appropriate without further proof of injury.

*Id.* at 402 (citations omitted). *See also Shapiro, Lifschitz & Schram, P.C. v. Hazard,* 24 F.Supp.2d 66, 75 (D.D.C.1998)(to recover legal fees paid to attorney who breached fiduciary duty, client is not required to demonstrate proximate cause and injury, but must do so to recover compensatory damages).

■ We conclude, based on the judgment in *Maxwell,* the *dictum* in *Riss,* and the legal principles recognized in *Hendry,* that District of Columbia courts would allow a limited partner to recover nominal damages for a managing general partner's breach of fiduciary duty without proof of a monetary loss stemming from that breach. Although an attorney's fiduciary duties to clients are more extensive, a managing general partner also works in a trusted capacity to protect the financial interests of the individual partners. Both relationships are governed by the terms of an agreement as well as fiduciary standards established as a matter of statutory and common law. A general partner's breach of fiduciary duty inherently diminishes the value of his management of partnership affairs, in that it necessarily decreases the level of trust that a limited partner can place upon the general partner's management of the partnership affairs.

Here, the trial court ruling implicitly recognizes that, if the jury concluded that Alloy and Farshey breached their fiduciary duties by failing to disclose to the Trust that other warehouse properties were available in the V Street market and/or that they were simultaneously wearing two hats as leasing agents for both the Partnership's warehouse properties and their own competing properties, then the jury also might conclude that there was sufficient injury to the Trust to merit a judgment in its favor. We agree that some recognition of such injury is appropriate without further proof that the breach proximately caused economic losses.

Despite inconsistent terminology in the case law, we find cogent support for this theory of fiduciary liability in *Hendry* and other persuasive cases. As a threshold matter, this result is consistent with established precedent that nominal damages may be appropriate when the plaintiff establishes wrongful

conduct that amounts to a "technical violation" of legal rights, but does not establish economic damages. *See generally* 1 Dan B. Dobbs, *Law of Remedies* § 3.3(2)(2d ed.1993)(discussing cases in which nominal damages are recoverable upon a finding that the wrongful conduct occurred, including trespass, breach of contract, and certain intentional tort actions). *See, e.g., Chesapeake & Potomac Tel. Co. v. Clay,* 194 F.2d 888, 890 (D.C.Cir.1952)(remanding for entry of $1 nominal damage award for breach of contract where plaintiff did not prove resulting "injury"); *Maxwell,* 709 A.2d at 103–04 (affirming trial court's ruling that injury sufficient to support nominal damage award may be predicated on proof of technical violation of legal right, without proof of "real damage"); *Conner v. Hart,* 252 Ga.App. 92, 555 S.E.2d 783, 786 (2001)("Damages . . . may be inferred from invasion of a property right").

Moreover, permitting a partner to obtain judgment on a breach of fiduciary duty claim without requiring proof of monetary damages serves purposes other than compensating for out of pocket losses. The prospect of such a judgment may deter the type of disloyalty, bad faith, and nondisclosure reached by an action for breach of fiduciary duties. *Cf. Hendry,* 73 F.3d at 402 ("Forfeiture of legal fees . . . . deters attorney misconduct, a goal worth furthering regardless of whether a particular client has been harmed"). Alternatively, the judgment itself might be a catalyst for changes in management or, in an appropriate case, for dissolution of the partnership itself. *See generally* Dobbs, *Remedies, supra,* § 3.3(2) (recognizing that suit may be brought to recover nominal damages "much as declaratory judgment suits are brought, to determine a right"). Finally, such a judgment permits the non-breaching partner to shift expenses incurred in litigating a breach of fiduciary duty to the breaching partner, through an award of costs. *See generally id.* ("the nominal damages award is, realistically, a rescue operation" that shifts litigation costs to the defendant when the plaintiff proves wrongful conduct but fails to prove the amount or fact of its monetary injury).

For all of these reasons, we conclude that under District of Columbia law, a plaintiff limited partner who presents evidence that managing general partners breached their fiduciary duties of loyalty and good faith by secretly acquiring and promoting competing properties is entitled to have its request for nominal damages for breach of fiduciary duty presented to the jury. This holding and rationale is also consistent with persuasive case law from other jurisdictions, in which nominal damages have been awarded when the plaintiff proves breach of fiduciary duty, but not monetary damages. *See, e.g., L.A. Draper & Son, Inc. v. Wheelabrator–Frye, Inc.,* 813 F.2d 332, 338 (11th Cir.1987)(under Alabama law, "where an agent breaches his fiduciary duty, his employer is entitled to nominal damages even where there is a failure of proof regarding actual damages"); *In re Wiggins,* 273 B.R. 839, 881 (Bankr.D.Idaho 2001)(awarding nominal damages of $100 for breach of fiduciary duty when plaintiff failed to prove amount of damages); *O'Reilly v. Transworld Healthcare, Inc.,* 745 A.2d 902, 917 (Del.Ch.1999)("So long as the plaintiff pleads sufficiently the other specific elements of a breach of the fiduciary duty of disclosure arising from a false statement, omission or partial disclosure, a plaintiff may request nominal damages, without pleading causation or actual quantifiable damages"); *Garcia v. Coffman,* 124 N.M. 12, 946 P.2d 216, 226 (App.)(affirming award of $1 in nominal damages for breach of fiduciary duty), *cert. denied,* 123 N.M. 626, 944 P.2d 274 (N.M.1997).

The cases cited by Alloy and Farshey to challenge the judgment in favor of the Trust do not persuade us otherwise that the Trust's cause of action for breach of fiduciary duty fails without proof of monetary loss caused by the breach. None of these cases considers that issue.

As discussed above, the *Hendry* decision authorizes recovery of attorney's fees for breach of fiduciary duty on a restitutionary disgorgement theory, while articulating policy and practice considerations that support by analogy an award of nominal damages for breach of fiduciary duty by a general partner. The quoted language from *Day v. Avery,* 548 F.2d

1018, 1029 n. 56 (D.C.Cir.1976), *cert. denied,* 431 U.S. 908, 97 S.Ct. 1706, 52 L.Ed.2d 394 (1977), acknowledging that breach of fiduciary duty is actionable if "injury accrues to the beneficiary *or the fiduciary profits thereby* " (emphasis added), is consistent with the broader principle recognized in *Hendry,* and applied here, that a cause of action for nominal damages may lie in order to hold the fiduciary responsible for his breach. *Griva v. Davison,* 637 A.2d 830, 848–49 (D.C.1994), is inapposite because it involves a civil conspiracy cause of action, which requires proof of "an injury caused by an unlawful overt act performed by one of the parties to the agreement[.]" Finally, the holding in *AMERCO v. Shoen,* 184 Ariz. 150, 907 P.2d 536, 542 n. 7 (App.1995), that Nevada does not recognize a claim for nominal damages for breach of a fiduciary duty to disclose a corporate opportunity, is not persuasive in light of the authorities and policies reviewed above,[17] and because it explicitly exempts cases such as this, involving self-interested diversion of opportunities.

## II.

### The Trust's Cross–Appeal: Judgment On Freeze–Out Claim

As alternative grounds for its breach of fiduciary duty claim, the Trust asserted that Alloy and Farshey attempted to "squeeze" the Trust, through a combination of financially coercive tactics, many of which are permitted by the Partnership Agreement, but only when undertaken in good faith for

---

**17.** The *Shoen* decision has been criticized as "an example of judicial overuse of the business judgment rule in a close corporation" context. *See* F. Hodge O'Neal & Robert B. Thompson, *O'Neal's Oppression of Minority Shareholders and LLC Members* § 3.3 (Westlaw database updated through Oct. 2007)(*"O'Neal's Oppression "*). Precedents from publicly held corporations should not be broadly applied to a family corporation. *See id.* Thus, the broad discretion given to directors of a publicly held corporation, who own "a minuscule portion of the company's shares," in blocking a hostile takeover is not appropriate when "one of two competing factions in a close corporation . . . uses the power of incumbency to exclude the other group." *Id.*

the benefit of the Partnership.[18] *See infra* Part I. It is well established that a general partner may breach its fiduciary duty by "freezing" or "squeezing" out a limited partner.[19]

> By the term "squeeze-out" is meant the use by some of the owners or participants in a business enterprise of strategic position, inside information, or powers of control, or the utilization of some legal device or technique, to eliminate from the enterprise one or more of its owners or participants.... "[P]artial squeeze-outs" ... [refer to] action which reduces the participation or powers of a group of participants in the enterprise, diminishes their claims on earnings or assets, or otherwise deprives them of business income or advantages to which they are entitled. A squeeze-out normally does not contemplate fair payment to the squeezees for the interests, rights, or powers which they lose.

F. Hodge O'Neal & Robert B. Thompson, *O'Neal and Thompson's Oppression of Minority Shareholders and LLC Members* § 1:1 (Westlaw database updated through Oct. 2007)("O'Neal's Oppression").

---

**18.** In its Second Amended Complaint, the Trust alleged:

> 48. Alloy and Farshey have breached the fiduciary duties and duties of loyalty owed to the Trust by offering no more than $1 million for the Trust's 38–percent ownership interest in the Partnership despite the fact that the Partnership Properties are worth at least $50 million.

> 49. Alloy and Farshey have breached the fiduciary duties and duties of loyalty owed to the Trust by attempting to "freeze out" the Trust from the benefits of its ownership of thirty-eight percent of the Partnership.

**19.** "The term 'freeze-out' is often used as a synonym for 'squeeze-out.' " F. Hodge O'Neal & Robert B. Thompson, *O'Neal and Thompson's Oppression of Minority Shareholders and LLC Members* § 1:1 n. 2. Some commentators use "squeeze-out" to mean "the situation where majority owners in a business cut off the minority from any say in management, and, far more importantly, from any significant distribution of the business' earnings," and define "freeze-out" to mean "the situation in which the majority uses legal compulsion (a sort of business eminent domain) to force an unwilling minority to sell out its interest." Franklin A. Gevurtz, *Squeeze-outs and Freeze-outs in Limited Liability Companies,* 73 Wash. U. L.Q. 497, 498 (1995)

In contrast to a minority partner in an "at-will" partnership, who can respond to such oppression by simply dissolving the partnership, a minority partner in a partnership established for a term of years has limited dissolution rights. For this reason, courts and commentators have recognized that term partnerships are vulnerable to the same type of squeezing and freezing commonly seen in other forms of privately held business entities, including close corporations and limited liability companies. *See, e.g.,* Franklin A. Gevurtz, *Preventing Partnership Freeze–Outs,* 40 Mercer L.Rev. 535, 573–74 (1989) ("Setting a term for the partnership removes the protection" available to partners who retain the right of dissolution at will, thereby making term partnerships vulnerable to squeeze-out techniques used in non-public corporations and LLCs). In all of these contexts, the illiquidity of the business interest creates "a breeding ground for majority ... oppression of minority owners[.]" Sandra K. Miller, *What Buy–Out Rights, Fiduciary Duties, and Dissolution Remedies Should Apply in the Case of the Minority Owner of a Limited Liability Company?,* 38 Harv. J. on Legis. 413, 436 (2001). Accordingly, we find the following explanation for the dilemma facing minority shareholders in close corporations equally applicable to limited partners in a partnership for a term of years:

The acute vulnerability of minority shareholders in the closely-held corporation .... stems principally from two factors. Because of its controlling interest, the majority is able to dictate to the minority the manner in which the corporation shall be run. In addition, shares in closed corporations are not publicly traded and a fair market for these shares is seldom available. In contrast, a partner [in an at-will partnership] can act to dissolve a partnership and a shareholder in a large public-issue corporation can sell his stock on the market if he is dissatisfied with the way things are run. Dissension within the close corporation tends to make the minority interest even more unattractive to a prospective purchaser. As a consequence, a shareholder challenging the majority in a close corporation finds himself

on the horns of a dilemma, he can neither profitably leave nor safely stay with the corporation. In reality, the only prospective buyer turns out to be the majority shareholder.

*Orchard v. Covelli,* 590 F.Supp. 1548, 1557 (W.D.Pa.1984), *aff'd,* 802 F.2d 448 (3d Cir.1986).

■ The tactics used to squeeze a minority interest vary. In the partnership context, the means may involve one partner's use of dissolution or transfer rights to force a below-market sale or liquidation, misappropriation of tangible assets through transfers to a new entity that excludes the "squeezed" partner, or otherwise undertaking "to make life in the firm sufficiently miserable for the other partner so that he will" seek a way out of the partnership. *See Gevurtz, Preventing Partnership Freeze–Outs, supra,* 40 Mercer L.Rev. at 573. We have not been cited to a District of Columbia case addressing a limited partner squeeze-out claim. Nevertheless, courts have widely recognized that a general partner's exercise of management authority with the goal of putting coercive financial pressure on a limited partner may amount to a squeeze-out in breach of the general partner's fiduciary duties, even though that exercise of authority is explicitly permitted by the partnership agreement. "[W]hether a technical breach has occurred is not the sole consideration" because "actions taken in accordance with a partnership agreement can still be a breach of fiduciary duty if partners have improperly taken advantage of their position to obtain financial gain." *Schafer v. RMS Realty,* 138 Ohio App.3d 244, 741 N.E.2d 155, 175, *appeal not allowed,* 90 Ohio St.3d 1472, 738 N.E.2d 383 (Ohio 2000). Thus, "actions allowed by an agreement can be a breach of fiduciary duty when they are not taken in good faith and for legitimate business purposes." *Id.* at 175–76.

In *Della Ratta v. Larkin,* 382 Md. 553, 856 A.2d 643 (2004), for example, our Court of Appeals affirmed a breach of fiduciary duty judgment based on the general partner's decision to satisfy a partnership debt through a capital call rather than a refinancing loan. Although the general partner was authorized to make capital calls, there was sufficient evidence

to support a finding that "a significant motivation for Della Ratta [the general partner] issuing the capital call was to squeeze out some of the limited partners." *Id.* at 579, 856 A.2d 643. In particular, "Della Ratta advanced the date of the capital call in order to 'out-maneuver' the Withdrawing Partners and block them from exercising their statutory right to withdraw." *Id.* at 580, 856 A.2d 643. Moreover,

> Della Ratta's failure to explore alternatives "less oppressive" than the capital call showed a lack of good faith, particularly because such options were readily available at the time. Expert testimony adduced before the trial court established that financing was available at historically low rates and that refinancing would have been prudent and typical in East Park's business under the circumstances. Nevertheless, Della Ratta never explored refinancing even though he told the limited partners he would do so.

*Id.* at 579–80, 856 A.2d 643.

The Court held that the general partner's "decision not to pursue refinancing options after assuring the Withdrawing Partners he would, and his decision to force-out the Withdrawing Partners and place them into default, did not comport with his fiduciary duty and were in bad faith." *Id.* at 580, 856 A.2d 643. Even assuming *arguendo* that the business judgment rule applies to limited partnerships, the Court reasoned, such protection for decisionmakers is not designed to be a safe harbor for a general partner who acts in bad faith. *See id.* Thus, neither the partnership agreement nor the deference typically given to business decisions supplied a defense to the general partner. *See also Schafer,* 741 N.E.2d at 176–77 (affirming jury verdict in favor of squeezed-out partner, based on evidence that majority partners "joined together and issued a capital call in order to squeeze [him] out of a lucrative deal, dilute his partnership interest, and take the profit for themselves").

A *modus operandi* of oppression similar to the one allegedly used by Alloy and Farshey generated a jury question in the frequently cited case of *Labovitz v. Dolan,* 189 Ill.App.3d 403,

136 Ill.Dec. 780, 545 N.E.2d 304 (1989), *appeal denied,* 129 Ill.2d 564, 140 Ill.Dec. 672, 550 N.E.2d 557 (1990). There, the evidence was sufficient to get to the jury on the theory that the general partner breached his fiduciary duty by subjecting limited partners to phantom tax liability, at the same time the general partner authorized only small cash distributions and offered to buy the minority interest for two-thirds of its book value. The appellate court specifically rejected the general partner's argument that he was entitled to judgment because the partnership agreement gave him sole discretion to determine the amount of cash distributions, if any. In exercising that authority, the Illinois court held, the general partner "still owed his limited partners a fiduciary duty, and fairness in his dealings with them and the funds of the partnership." *Id.* at 780, 545 N.E.2d at 310.

Our courts are not bound to endow it as doctrine that where the general partner obtains an agreement from his limited partner investors that he is to be the sole arbiter with respect to the flow that the cash of the enterprise takes, and thereby creates conditions favorable to his decision that the business is too good for them and contrives to appropriate it to himself, the articles of partnership constitute an impervious armor against any attack on the transaction short of actual fraud. That is not and cannot be the law. And **that is precisely the gravamen of plaintiffs' complaint: that the general partner refused unreasonably to distribute cash and thereby forced plaintiffs to continually dip into their own resources in order to pay heavy taxes on large earnings in a calculated effort to force them to sell their interests to an entity which Dolan owned and controlled at a price well below at least the book value of those interests. Such a claim plainly presents an issue for the finder of fact, namely, whether or not Dolan was serving his own interests or those of the partnership.** Although defendants state in their brief that Dolan allocated the partnership's funds to meet its needs and to serve its purposes, and although in oral argument defendants represented that the partnership was continually short of cash,

the record at this stage is totally devoid of any such evidence. To be sure, all of the allegations made by plaintiffs in their complaint and noted above stand, according to the record made in this case, as unrebutted, undenied, unexplained and uncontroverted.

Plaintiffs therefore correctly maintain that they "were entitled to a trial in which Dolan must prove he acted fairly and not as his limited partners' business adversary."

*Id.* at 780, 545 N.E.2d at 313–14 (emphasis added).

 Accordingly, as the *Labovitz* Court recognized, "[i]n determining whether to make distributions the general partner must act in good faith." Callison & Sullivan, *Partnership Law and Practice, supra,* § 22:13. A general partner's broad authority over distributions, although granted by a partnership agreement, is conditioned by his unwaivable duties of loyalty and good faith. *See Labovitz,* 136 Ill.Dec. 780, 545 N.E.2d at 313–14. The burden rests on the fiduciary to prove that his or her exercise of power under the terms governing the business relationship was in good faith. *See Helms v. Duckworth,* 249 F.2d 482, 488–89 (C.A.D.C.1957).

### The Record

At trial, the Trust presented evidence of the following:

- Over seven of the nine years between 1988 and 1997, there were 18 cash distributions to partners, including two distributions totaling $900,000 in 1997. From these distributions, the Trust received, as its 4.2 percentage share under the Partnership Agreement, a total of $251,673.

- Reed Wills filed for bankruptcy protection in early 1991. Alloy and Farshey acquired Reed Wills's general partnership interest from the bankruptcy trustee in July 1994, for $860,000. Thereafter, Alloy and Farshey did not include the Trust in Partnership meetings or decisions. Instead, they acquired competing warehouse properties without offering these to the Partnership, or advising the Trust of such acquisitions. In addition, they simultaneously acted as leasing agents for both the Partnership and their own

entities who were competing with the Partnership in the same market, without advising the Trust of their dual roles. *See supra* Part I.

- In the six years from 1998 through 2003, the period immediately preceding this litigation, Alloy and Farshey exercised their Partnership rights in a manner that resulted in no cash distributions to the Trust, or any other partner.

- During this same period from 1998–2003, the Trust was allocated a total of $574,800 in taxable income. After allocations of $8,800 in 2001 and $15,000 in 2002, the Trust was allocated $551,000 in taxable income in 2003.

- This significant increase in the Trust's tax liability occurred in the 2003 tax year, the same year that Dan Clemente became a co-trustee of the Trust.

- Alloy confronted Clemente at a September 8, 2003 fundraiser, where Clemente introduced himself as the recently appointed trustee for the Trust. According to Clemente, Alloy immediately started "screaming at me that he knew who I was" and "about this million dollar offer that he had made to Mr. [Liptz], that we would never get more than a million dollars for . . . this 38 percent interest[.]"

The following table illustrates this evidence:

| Year | Total Distributions to Trust (No. of distributions) | |
|---|---|---|
| 1988 | $99,150 (6) | |
| 1989 | $17,640 (1) | |
| 1990 | $4,200 (1) | |
| 1991 | $8,400 (1) | R. Wills filed bankruptcy in February 1991. |
| 1992 | $0 (1) | |
| 1993 | $0 (0) | |
| 1994 | $36,183 (3) | Alloy and Farshey acquired R. Wills's interest in July 1994, through SMC-V Street LP. The Trust is thereafter not advised of Partnership meetings and affairs. |
| 1995 | $29,400 (1) | |
| 1996 | $18,900 (1) | |
| 1997 | $37,800 (2) | Alloy and Farshey secretly acquired 2900 V Street in April 1997, through SMC-V Street LP. |
| Subtotals | $251,673 | |
| 1998 | $0 (0) | |
| 1999 | $0 (0) | |
| 2000 | $0 (0) | |
| 2001 | $0 (0) | |
| 2002 | $0 (0) | Alloy and Farshey secretly acquired 3001 V Street, through SMC Learning Centers. |

| | | |
|---|---|---|
| 2003 | $0 (0) | Daniel Clemente became a Trustee of the Trust in August 2003. In September, Alloy told Clemente that the Trust would never get more than a million dollars for its interest. The Trust was allocated $551,000 in taxable income for this year, allegedly because a review requested by Alloy and Farshey discovered under-allocations in prior years. |
| **Subtotal** | $0 | |
| 2004 | $34,860 (3) | The Trust filed this lawsuit in June 2004. |
| 2005 | $10,500 (1) | |

In addition to this evidence, counsel for the Trust attempted to cross-examine Alloy about his warning that the Trust would never get more than one million dollars for its interest, and to show that Alloy was aware at the time that the Partnership property had been appraised for $50 million. Counsel argued unsuccessfully that such evidence should be admissible to prove a freeze out scheme, as follows:

[Counsel for the Trust]: If he knows that the property is worth at least 50 million and he's telling the [T]rust basically you'll never get more [than] $1 million out of me, which [is] what he said on two different occasions, that's relevant to the freeze-out scheme, Your Honor. That's telling them I'm not even going to consider anything . . . that even has any connection whatsoever to the real interest and the value. . . . We're not arguing they had a fiduciary duty to buy [out the Trust], but there is a breach of fiduciary duty when you make life extremely difficult for the partners, when you keep them out of the loop, when you don't pay them management fees. . . .

The Court: I agree with that.

[Counsel for the Trust]:—tangible benefit, and then you say you're only going to get $1 million for something that is—it's not like he says you're only going to get what's reasonable.

The Court: The objection is sustained. I'm not going to let you ask him the question.

The circuit court granted defense motions for judgment on the Trust's claim that Alloy and Farshey breached their fiduciary duties by conduct that amounts to a limited partner "freeze out" scheme. When Alloy and Farshey first moved for judgment on the Trust's "freeze out" claim, the trial court

concluded that the only evidence that might support such a theory was the allegedly retaliatory tax allocation in 2003. The court ruled that "there's some ... inference that allocation was in retaliation for a dispute over whether or not they were trying to freeze [the Trust] out ... and only offering them ... a substandard offer as to the value of their limited partnership interest." Noting that there had not yet been "proof of actual damages," and that "[t]he freeze out is hanging on by a thread" on the basis of this tax allocation evidence, the court denied the motion "at this time."

At the close of all evidence, Alloy and Farshey successfully renewed their motion for judgment, arguing that "there has to be damage to the Trust" from the breach of duty alleged. The following colloquy occurred:

> The Court: Tell me what evidence there is with respect to [the 2003 tax allocation], other than that the Trust doesn't pay income taxes and that it's passed on directly through to Joanne Wills and to P. Reed Wills—.... and that was the testimony of Sheldon Liptz.
>
> [Counsel for the Trust]: I believe he said that somebody has to pay the phantom income. And recall, Your Honor, it's only in because of the retaliation issue, and there's been no evidence in the defendant's case to go against that.... I haven't seen anything of a rebuttal on that issue, Your Honor. So, we would certainly stand on where we were on Friday afternoon and submit that we're entitled to go to the jury ... because this ... goes to the retaliation issue....
>
> The Court: I just think it's way too tentative, especially in light of Mr. Liptz's testimony by way of his deposition.[20] So, I am going to grant the judgment as to the allocation of income to the [T]rust in 2003.

---

**20.** On cross-examination, Sheldon Liptz, the Wills' accountant, testified that all income to the Trust "is distributed to the beneficiary of the [T]rust, during the life of the grantor. Beneficiary being Joanne Wills." Thus, "income attributed to the Wills Family Trust—on account of its limited partnership interest in SMC United Industrial Limited Partnership—[is] passed through to Mrs. Wills, since she's the beneficiary" during her lifetime.

## Cumulative Sufficiency Of The Evidence

We must consider whether a jury could reasonably conclude that, through the combined effect of bad faith conduct, Alloy and Farshey attempted to squeeze the Trust. *See, e.g., Sugarman v. Sugarman,* 797 F.2d 3, 6 (1st Cir.1986)(recognizing that a "combination of factors" might persuade a jury that there was a freeze out attempt). The trial court's final ruling that the Trust could not present its oppression claim to the jury is phrased as a grant of "judgment as to the allocation of income to the [T]rust in 2003," because the court previously had ruled that the Trust could not prove a squeeze-out scheme with evidence that Alloy and Farshey threatened that the Trust would not receive more than a million dollars for its interest or evidence that there were no cash distributions for a five year period immediately preceding this lawsuit. This pattern of rulings suggests that the court may not have considered the totality of this evidence in determining whether a reasonable juror could find that Alloy and Farshey attempted to prevent the Trust from obtaining any financial benefit from its minority interest.

After reviewing the record as a whole, we find the evidence sufficient to generate a jury question on the Trust's squeeze-out claim. One aspect of the freeze-out scheme that the court did not discuss in its *seriatim* rulings was Alloy and Farshey's secret acquisition and promotion of competing properties. In addition to viewing this evidence as proof that Alloy and Farshey acted in bad faith by secretly competing with the Partnership, a fact-finder might regard the same evidence as one component of Alloy and Farshey's attempt to put financial pressure on the Trust. A reasonable juror could conclude that the impact of such secret competition was compounded by the elimination of cash distributions until the Trust began to protest through Clemente, and by the surprise allocation of more than a half million in taxable income to the Trust.

A jury may find the $551,000 tax allocation particularly troubling, in that it resulted from a one-time discovery of an alleged error at a particularly opportune time for Alloy and

Farshey, *i.e.,* shortly after Clemente began his inquiries and demands on behalf of the Trust. During the Trust's cross-examination of Alloy, after the trial court precluded counsel for the Trust from asking whether Alloy knew the Partnership properties had been appraised for $50 million at the time he offered the Trust $1 million for its interest, counsel established a potentially troublesome time line in support of the Trust's retaliatory tax allocation theory. Alloy admitted that he attended a fundraiser on September 8, 2003, at which he told Daniel Clemente that the Trust would never get more than a million for its interest. Counsel for the Trust then continued:

[Counsel for the Trust]: Now, that's on September 8th. On October 10th our firm sends the letter regarding management fees, and ... that letter is then shared with you by your counsel, correct?

[Alloy]: Correct.

Q: And then within a few months after both of these things happened, you made a decision which resulted in the Internal Revenue Service on a K–1 being informed that the Wills Family Trust had income for 2003 of more than $550,000, correct? ...

A: Our accountants prepared a partnership tax return, and the Wills Family Trust got a K–1 that had over a half a million dollars of taxable income to them for the particular year, and approximately 40 to 60,000 I don't know the exact amount, was giving them income from prior years that Fred and I paid tax on because of the [law]suit. We had our accountants go over everything with a fine-toothed comb to make sure that we were doing everything correct. And we found that in prior years we didn't charge the [T]rust enough income. And we corrected it this year, so they got the benefit of not paying taxes for a few years. And I also think the tax rate went down so that they really had lower taxes to pay because of that.

Q: Did I understand you to say that because of this dispute with the [T]rust, you went back to the accountants

and as a result of that you ended up finding more income to allocate for tax purposes to the [T]rust?

A: No, we found that they had made a mathematical error in calculating income in prior years. . . .

We agree with the Trust that such evidence might be viewed by a fact-finder as proof that Alloy and Farshey acted in bad faith when they allocated to the Trust more than a half million dollars in income in 2003, despite having allocated only $8,800 and $15,000 in income for 2001 and 2002 respectively and nothing in prior years. The timing and size of this allocation raise red flags that could support a finding that it represents improper retaliation for the investigation and demands made by the Trust through Clemente in 2003. Alternatively, even if the jury were to accept Farshey's explanation for the 2003 allocation at face value, it could conclude, given that the Trust's 38% reallocated share of recent taxable income was $551,000, that the Partnership had been earning enough to warrant some cash distribution during the five years immediately before litigation began, when no distributions were made.

When we consider the evidence of secret competition in combination with Alloy and Farshey's exercise of their management rights to discontinue, for the five years immediately before this lawsuit was filed, what had been a regular pattern of cash distributions over the previous nine-year period,[21] as well as the sudden 2003 allocation to the Trust of more than $550,000 in taxable income at a time when the Trust was asserting its rights and Alloy was responding that the Trust would never get more than one million for its interest in the Partnership, we conclude that a jury could reasonably find that Alloy and Farshey acted in bad faith, in an effort to either freeze the Trust out of the financial benefits of the Partner-

---

**21.** From 1988, when the Trust made its first cash distribution, through 1997, cash distributions were made in every year except 1993. Although neither Reed Wills (who was in bankruptcy at the time) nor the Trust received a cash distribution in 1992, a total of $300,000 was distributed to other partners on June 25, 1992.

ship, or to financially coerce the Trust into selling its interest at a below-market price. We reject Alloy and Farshey's argument that the trial court's grant of judgment "was proper because the Trust failed to adduce any evidence that any of the conduct complained of was wrongful or actionable[.]" As in *Labovitz*, the authority granted to Alloy and Farshey by the Partnership Agreement does not shield these fiduciaries from liability for the bad faith exercise of that power as a means of squeezing the Trust out of the financial benefits of the Partnership.

Let us be clear that there is evidence from which a jury could conclude that Alloy and Farshey had legitimate and non-pretextual business reasons for discontinuing cash distributions and for belatedly allocating taxable income to the Trust. But that simply means that there was sufficient evidence to reach the jury on the question of whether these decisions were undertaken in bad faith for the purpose of squeezing the Trust. It was not the task of the trial court to weigh the evidence and resolve the conflicting factual inferences as a matter of law. We shall vacate the judgment and remand to allow the Trust to present its oppression theory to the jury.

### III.

#### The Trust's Cross–Appeal: Exclusion Of Expert Testimony On Damages

Md. Rule 5–702, governing expert testimony, provides:

> Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine ... whether a sufficient factual basis exists to support the expert testimony.

In its cross-appeal, the Trust argues that the trial court erred in excluding its proffered expert opinions of value that would have supported (a) an award equal to the value of the Trust's 38% interest in the Partnership as the proper measure of damages for oppression, and (b) an award of actual dam-

ages arising from Alloy and Farshey's failure to tell the Partnership about an opportunity in 1993 to sell the Partnership properties for $5 million over appraised value. As detailed above in the Facts and Legal Proceedings section of this opinion, the Trust's real estate appraiser (Mr. Harvey) was prepared to give his expert opinion that the Partnership properties were worth $50,000,000, and the Trust's accounting and valuation expert (Mr. Porter) proffered that the Trust suffered $4.2 million in damages from the failure to sell the Partnership properties in 1993, and that the Trust's 38% interest in the Partnership is worth approximately $11.3 million. We address each of the alleged errors in turn to the extent such evidentiary issues are likely to recur on remand.

The Trust argues that the trial court erred in excluding testimony by both of its experts that is essential to determining the value of the Trust's 38 percent interest in the Partnership. Citing this Court's decision in *Edenbaum v. Schwarcz-Osztreicherne*, 165 Md.App. 233, 260–61, 885 A.2d 365 (2005), the Trust posits that such evidence is relevant because an oppressed partner may be entitled to recover the present value of its interest in the Partnership. In this manner, the aggrieved partner is compensated while the profitable partnership business is preserved. *See id.*

Our decision to remand for trial of the Trust's alternative breach of fiduciary duty theory arising from an alleged squeeze-out means that some of this evidence may be admissible when that oppression claim is tried. Specifically, Mr. Harvey's opinion that the value of the Partnership properties exceeds $50 million, as well as Mr. Porter's opinion that the value of the Trust's 38% interest in the Partnership exceeds $11 million, may prove to be relevant to the Trust's oppression claim. If such opinions otherwise satisfy the criteria for admissibility, a jury might be more likely to find that Alloy and Farshey "lowballed" and/or threatened the Trust with a $1 million buy-out offer as the capstone of their squeeze-out scheme. In addition, such evidence could be relevant if the "buy-out" remedy is found to be appropriate. *See* D.C.Code

§ 33–107.01(a) ("If a partner is disassociated from a partner-ship without resulting in a dissolution and winding up of the partnership business ..., the partnership shall cause the dissociated partner's interest in the partnership to be pur-chased for a buyout price determined pursuant to subsection (b)"). As for Porter's opinions with respect to damages attributable to the allegedly lost opportunity to sell Partner-ship Properties in 1993, the trial court should reconsider whether such evidence should be excluded on "late filing" grounds, in light of this appeal and the remand ordered herein.[22]

## IV.

### The Trust's Cross–Appeal: Striking Of Third Amended Complaint

The Trust complains that the motion court erred in forcing it to separately litigate its breach of fiduciary duty claims against appellants, by striking the Trust's Third Amended Complaint, and then denying leave to voluntarily dismiss the case so that all the Trust's claims could be tried together. This complaint is mooted by our remand for trial of the squeeze-out claim.[23] If the Trust has not already tried the new claims asserted in the Third Amended Complaint, the remand court may consider whether to try these claims to-gether with the squeeze-out claim.

---

**22.** As noted, the Trust filed a Third Amended Complaint on October 28, 2005, adding *inter alia* the claim arising from Alloy and Farshey's alleged failure "to disclose an opportunity to sell the Partnership Property for $5 million more than the appraised value in 1993[.]" The Trust also alleged a new claim based on certain allegedly baseless and retaliatory threats to the Trust after the Second Amended Complaint was filed. The trial court struck the amended complaint, in part because the claim arising from the 1993 purchase offer introduced a "new issue" that unduly prejudiced Alloy and Farshey's preparations for the January 23, 2006 trial, in that the new claim "would require a continuance of the trial date" and "reopening of discovery."

**23.** Alloy and Farshey's motion to strike a portion of the Trust's reply brief is denied in light of our decision.

## V. and VI.

### The Trust's Cross–Appeal: Reformation And Dissolution

The Trust argues that the motion court erred in granting Alloy and Farshey's motion for summary judgment against the Trust's requests for reformation[24] or dissolution of the Partnership. Such remedies are theoretically available for breach of a fiduciary duty. *See generally* D.C.Code § 33–108.01(5)(B)(term partnership is dissolved when, "[o]n application by a partner," a court makes "a judicial determination that ... [a]nother partner has engaged in conduct relating to the partnership business which makes it not reasonably practicable to carry on the business in partnership with that partner"); *Cafritz v. Cafritz,* 347 A.2d 267, 269 (D.C.1975)(recognizing availability of reformation and dissolution remedies for breach of a partner's fiduciary duty); Gevurtz, *Preventing Partnership Freeze–Outs, supra,* 40 Mercer L.Rev. at 547 (in lieu of dissolution, "the victimized partner [might] concede the business and simply demand payment for the appraised value of his interest as well as compensation for the delay in payment"). On remand, if the jury renders a verdict in favor of the Trust on its breach of fiduciary duty claim, the Trust will have an opportunity to argue for reformation or dissolution as an appropriate remedy.

**JUDGMENT AFFIRMED IN PART, VACATED IN PART. CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLANTS/CROSS–APPELLEES.**

■■■■■■■■■

---

**24.** When the appropriate remedy for breach of fiduciary duty is a buy-out in lieu of dissolution, for example, the partnership agreement would need to be reformed to reflect withdrawal of partners.